## DANNY LEE KING

### V.

## COMMONWEALTH OF VIRGINIA

Record Nos. 911585 and 911586

April 17, 1992

Present: All the Justices

354

*David J. Damico; James R. Swanson (Damico and Apgar; Phillips, Doherty & Swanson*, on brief), for appellant.

*Michael T. Judge, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In the first phase of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Danny Lee King of capital murder in the commission of robbery while armed with a deadly weapon. Code § 18.2-31(4). In the second phase, the jury fixed King's punishment at death, based upon both the predicates specified in Code § 19.2-264.2, which, in previous opinions, we have termed "future dangerousness" and "vileness." The jury also convicted King of robbery, two offenses of forgery, and two offenses of uttering, with punishment fixed at life imprisonment for robbery and ten years' imprisonment for each of the other four non-capital offenses.

After considering a post-sentence report prepared by a probation officer, Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury. King is before this Court for automatic review of his death sentence, and we have consolidated that review with his appeal of his capital murder conviction. Code § 17-110.1. We have also certified from the Court of Appeals King's convictions for the non-capital offenses with which he was charged, Code § 17-116.06, and we have given the entire matter priority on our docket, Code § 17-110.2.

The record shows that on October 1, 1990, King was released on parole from imprisonment for a prior offense. On October 8, he and Becky Hodges King, with whom he had entered into a bigamous marriage in January of 1989, stole a van from a used car lot in Chesterfield County. They then travelled to the home of King's mother in Christiansburg, where Becky had been staying during King's imprisonment.

On October 11, King and Becky rode in the van to Roanoke and went to a residential area known as Kings Chase. As they drove around, Becky wrote on a yellow pad the names and telephone numbers of three real estate agents whose signs were displayed on vacant houses. Carolyn Horton Rogers was one of the agents whose name and telephone number Becky wrote down.

From a nearby shopping center and at King's direction, Becky used the name "Mrs. Keaton" and telephoned Ms. Rogers' office. She told the person who answered that "[she and her husband] wanted to see a house in Kings Chase." When informed Ms. Rogers was not in, Becky placed a call to the Rogers home. Ms. Rogers agreed to show the house in Kings Chase, and she left home about 10:00 a.m. to keep the appointment.

When Ms. Rogers did not return home or appear at her office, her son and two of her co-workers began looking for her. About 5:00 p.m., one of the co-workers entered the vacant house Ms. Rogers had agreed to show and found her body in the basement furnace room, lying face down in a pool of blood. She had been beaten, choked, stomped upon, and stabbed. A ring and an earring had been forcibly removed from her body and were missing, along with other jewelry. Ms. Rogers' automobile was found at a nearby shopping mall.

On the afternoon of the same day, three checks, forged by King and drawn on Ms. Rogers' account, were presented and cashed by Becky at Roanoke area banks. On the same afternoon, Becky pawned Ms. Rogers' ring at a local pawnshop.

Four days later, King and Becky were arrested in the stolen van in New Philadelphia, Ohio. At the time of his arrest, King spontaneously told Ohio police officers: "[Becky] doesn't know anything about this. I'm the one you want."

On October 16, James R. Lavinder, a detective with the Roanoke County Police Department, travelled to Carroll County, Ohio, where King and Becky were being held in jail. Lavinder carried with him a warrant charging Becky with the capital murder of Ms. Rogers, and Becky was returned to Roanoke and held for trial on that charge. King was returned to Virginia separately, but as a parole violator. He was not charged with the Rogers murder until January 4, 1991.

## ADMISSIBILITY OF STATEMENTS

In a pretrial motion, King sought to suppress statements he claimed "were illegally obtained." After a hearing, the trial court denied the motion, finding that the statements were made voluntarily and that "there was a knowing, intelligent and voluntary waiver [of counsel] as to those statements which [King] made." King contends the trial court erred in its denial of his motion to suppress.

King listed in the motion to suppress statements he allegedly made to the police in Ohio on October 16 and in Virginia on November 1 and 9.[1] King argues that the statements should have

---

[1] King also listed in his motion to suppress a "[s]tatement taken November 2, 1990 . . . while Defendant was in custody of Virginia authorities." King concedes on brief, however, that he initiated the conversation of November 2 and that "[n]othing germane to the in-

been suppressed because obtained in violation of *Edwards* v. *Arizona*, 451 U.S. 477 (1981), which held that an accused who expresses "his desire to deal with the police only through counsel . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." *Id.* at 484-85.

King first contends he was improperly questioned by Detective Lavinder in Ohio on October 16 after "[he] indicated that he wanted to talk with an attorney." As a result, King says, all statements he made following this indication, not only in the October 16 incident but in all subsequent interrogations as well, should have been suppressed. However, in argument following the close of evidence at the suppression hearing, defense counsel did not once mention the October 16 incident. Instead, he argued it was "clear that . . . the request for counsel took place on *November 1st*" and that "the statements given by Mr. King during [the] period after he requested [an] attorney on *November 1 . . .* should be suppressed." (Emphasis added.)

■ The Commonwealth's Attorney responded to King's argument concerning the incidents occurring on November 1 and 9, and, understandably, neither the prosecutor nor the trial judge made any comment concerning the October 16 encounter. Under the circumstances, we think King has waived the point concerning the incident of October 16, and, accordingly, we will consider only the events of November 1 and 9. Rule 5:25. King contends that, on each of these dates, he was interrogated by police after he indicated he wished to consult an attorney.

### The November 1 Incident

The evidence taken at the suppression hearing shows that after King was returned to Virginia from Ohio, he was held as a parole violator at the receiving unit of the Powhatan Correctional Center. On November 1, 1990, Detectives K. W. Kern and Philip Patrone of the Roanoke Police Department travelled to Powhatan

---

stant offenses was said in this conversation." Hence, we will not again mention the November 2 conversation in this opinion.

Further, King argues on appeal that a statement he made to the police on October 18, 1990, should have been suppressed. However, King failed to list this statement in his motion to suppress and did not include it in his argument at the suppression hearing. Hence, King has waived the point concerning the October 18 statement. Rule 5:25.

to execute an order to take King's fingerprints and to collect hair and blood samples from him.

The detectives were escorted to an interview room where King had been placed. Upon the officers' entrance, and before they "even had the opportunity to show him the Court Order," King asked what was taking them "so long." When they said, "so long for what," he responded, "to drop warrants on me, you know [Becky] didn't have anything to do with this, she'd follow a puppy dog."

Detective Kern then read King the *Miranda* warnings and explained to him the import of the court order requiring the taking of his fingerprints and the collection of hair and blood samples from him. Without any questioning by the detectives, King told them they would not "find anything," that he was "too good." At this point, King said that he wanted to make a statement but that he would make the statement only "one time" and "wanted a lawyer [for himself there], . . . wanted Becky's lawyers there, [and] wanted the Commonwealth's Attorneys [and Detectives Kern and Patrone] there." Kern explained that because King had not been charged with Ms. Rogers' murder, Kern did not "have any way of appointing him [an attorney] at [that] particular time" but that King could "retain an attorney if he wanted to." Later on during the detectives' visit, King repeated his request for a group encounter with the same cast of characters.

Although the detectives did not ask King any questions concerning the Rogers murder, King volunteered the statement that the detectives should be fingerprinting three other individuals, Thomas Carello, Dean Smith, and someone called "Hollywood." When Kern, "trying to identify who this person was," asked whether "Hollywood" was black or white, King replied that he was a white male. Kern told King he knew that only three people, Ms. Rogers, Becky, and King, were in "that house" at the time of the murder, to which King responded that he did not intend by naming other people to indicate "they had anything to do with this offense."

King asked the detectives whether "Becky had a boy friend," and Kern told him he "had no knowledge of Becky having a boy friend." Finally, King made the statement that if the detectives ever saw Thomas Carello they should tell him King was "going to kill him."

■ For several reasons, we reject King's argument that the circumstances of the November 1 encounter constituted a violation of the *Edwards* rule. First, at the time of the November 1 incident, King's right to counsel had not attached with respect to the murder of Ms. Rogers because " 'adversary judicial proceedings' had not yet been initiated on that charge." *Eaton* v. *Commonwealth*, 240 Va. 236, 252, 397 S.E.2d 385, 394 (1990) (quoting *Michigan* v. *Jackson*, 475 U.S. 625, 629 (1986)).

■ Second, we said in *Eaton* that a *clear* assertion of the right to counsel is necessary to invoke the *Edwards* rule. *Eaton*, 240 Va. at 253-54, 397 S.E.2d at 395-96. Here, King's assertion of his right to counsel was equivocal, being couched in terms of his willingness to make a statement conditioned not only upon the presence of his own attorney but also the presence of a cast of characters having no discernible relevance to the traditional atmosphere of confidentiality in which an attorney and client consult with one another.

■ Third, the detectives' encounter with King on November 1 did not constitute an interrogation within the meaning of either *Miranda* or *Edwards*. Contrary to King's assertion on brief that "the real purpose [of the detectives' visit to Powhatan] was to elicit further statements from [King]," the stated purpose of the visit, *viz.*, to .execute the court order directing the detectives to obtain specific forensic samples from King, was entirely legitimate. The officers did not deviate from that purpose. Before they had time to tell King the purpose of their visit or to give him the *Miranda* warnings, he asked them what was taking them so long "to drop the warrants" on him, and he volunteered the statement that Becky "didn't have anything to do with this." The only question the detectives asked King during the ensuing conversation related, not to Ms. Rogers' murder, but to the identity of someone called "Hollywood," a person King conceded had nothing to do with the murder and whose name King introduced into the conversation himself.

### The November 9 Incident

The evidence presented at the suppression hearing shows further that on November 9, Detectives King and Patrone again travelled to Powhatan, this time with a court order to transport King to Roanoke to obtain foot impressions and handwriting samples. When King was "picked up," he was advised of his "rights" under

*Miranda* and informed of the purpose of the trip. En route to Roanoke, the officers asked King "no questions," and he "made no statements regarding [Ms. Rogers' murder]."

In Roanoke, plaster casts were made of King's feet for comparison, and handwriting samples were taken from him for analysis. On several occasions during these procedures, King asked the detectives "what it was all about and what [they] hoped to gain by all of this." When the procedures were completed, King again asked, "what's all this for?" Kern responded that there was "a lot of lab work that needed to be done." Whereupon, King said: "[I]f you got questions, just ask me." The detectives proceeded to ask questions, and King proceeded to answer them.

King told the detectives he did not kill Ms. Rogers but "was there and involved in what happened." He said he did not see Ms. Rogers killed and did not know who killed her, although he proclaimed Becky's innocence. He claimed that there was "a contract on [Ms. Rogers]," that he was supposed to get her "in one of the three houses for sale in that area," and that the "guy who picked up the contract was supposed to be in the house when [King and Becky] got there." King stated he had earlier made a telephone call in which he "spoke with Dude, who carried the [contract]," but when he and Becky arrived at the house, Ms. Rogers was there, but Dude "wasn't in the residence."

At this point, King said he wanted to make a statement but wanted to make it in the presence of "an attorney for himself, somebody from the Commonwealth's Attorney's office, and Becky . . . and Becky's lawyers." Detective Kern told King that "he was not in custody on these particular charges, [the police] had not obtained any warrants for him, [the] case was still under investigation, and if he wanted an attorney, he could hire an attorney, that [Kern] had no way of appointing him an attorney."

King then asked to meet immediately with a representative from the office of the Commonwealth's Attorney, and Edwin R. Leach, an assistant prosecutor, was summoned to the jail. King was "again advised of *Miranda* rights." Without any further interrogation, King repeated "the same story" he had just told the detectives, and "that was the end" of the November 9 encounter.

We reiterate here what we said previously about King's assertion of his right to counsel being equivocal because his willingness to make a statement was conditioned upon the presence not only of his own counsel but also of an irrelevant cast of char-

acters. Furthermore, the *Edwards* rule is not violated if "the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485. By his questions to the detectives about why they were gathering evidence and especially by his statement, "if you got questions, just ask me," King clearly initiated the exchange which produced the admissions about which he complains.

> A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller* v. *Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to "the totality of all the surrounding circumstances," *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton* [v. *Commonwealth]*, 227 Va. [124,] 140, 314 S.E.2d [371,] 381 [*cert. denied*, 469 U.S. 873 (1984)].

*Gray* v. *Commonwealth*, 233 Va. 313, 324, 356 S.E.2d 157, 163, *cert. denied*, 484 U.S. 873 (1987). Applying these standards, we think the evidence fully supports the trial court's finding that King's statements were voluntary and that "there was a knowing, intelligent and voluntary waiver [of counsel] as to those statements which he made." Accordingly, we will not disturb the finding.

## SUFFICIENCY OF EVIDENCE OF GUILT

King contends the evidence is insufficient to show that he, rather than Becky, was the killer. Alternatively, he contends the

evidence is insufficient to establish that the killing was premeditated. We reject both propositions.

In addition to the evidence previously recited, the record shows that King and Becky met Ms. Rogers at the vacant house in Kings Chase and introduced themselves as "Danny and Becky Keaton." Ms.. Rogers showed them through the house, and the three of them eventually reached the basement. There, Becky asked King for a cigarette. He said he did not have any, and he suggested she get one from their van. Becky left and was gone "a few minutes."

What happened after Becky left was disclosed by the testimony of Vincent Austin Lilley, one of the attorneys appointed to represent Becky on her capital murder charge. On November 2, 1990, Lilley accepted a collect telephone call from King, who was calling from the Powhatan Correctional Center. King told Lilley that "[t]his thing with Becky is insane . . . because [she] did not do what she's charged with." When Lilley pointed out that Becky had cashed Ms. Rogers' checks and that the police had Becky "on film doing that," King said "she cashed checks because if she wouldn't have, [he] would have broken her damn neck, or she believed that." King asked Lilley to visit him, saying that what he wanted to talk with Lilley about "is the fact that [he, King, was] the one that should be charged with it." Lilley agreed to visit King, and he went to the correctional center on November 6 for that purpose.

On that date, King told Lilley that he was a member of "a Hell's Angels . . . motorcycle gang" and that Ms. Rogers' killing was a contract killing, a murder for hire, that was set up before he got out of the penitentiary. He said "a guy named Smoky" contacted him after his release from prison and asked for his help with "a hit." Smoky knew Ms. Rogers was a real estate agent and he wanted to have her show a vacant house because she was "the focus of this murder for hire." Smoky "had [already] been paid." However, Ms. Rogers was supposed to have at least $1,000 in her checking account and King "could get whatever he wanted off of Mrs. Rogers."

The plan was to have Becky call Ms. Rogers to arrange the meeting at the vacant house. King boasted to Lilley that he owned Becky, that she was his "property," and that "[if he] told her to do something, that was it." Lilley asked King how he knew Becky "didn't kill Ms. Rogers." At that point, King "took a little piece

of paper . . . and he wrote . . . in capital letters I D-I-D . . . and . . . he said, I did."

According to the plan, Smoky was supposed to "come creeping down the stairs and get in the basement," then King was to get Ms. Rogers to the basement and "knock her out to the point of unconsciousness," after which Smoky would "take her to another place and complete the contract killing." King told Lilley he did strike and choke Ms. Rogers until she was unconscious, but he did not stab her. Smoky appeared from the garage area and told King: "[T]hat's good enough. You've done your part." The last thing King saw was Smoky pulling Ms. Rogers' sweater "up over her head."

On December 6, Lilley, accompanied by John Gregory, Jr., Becky's co-counsel, and George Harris, III, Lilley's investigator, again visited King, this time at the Buckingham Correctional Center. After going over some forms with King, Lilley was about to introduce Gregory and Harris when King "just burst out, let's cut the b____ s____, I stabbed Carolyn Rogers to death. Becky had nothing to do with it. Now, what do you want to know?"

King reiterated that Ms. Rogers' death was a result of a contract killing, and he described how a contract killing is arranged. He went on to say that after Becky left to get a cigarette from the van, he asked Ms. Rogers "some question . . . and at that point he took his fist and hit her [on] the left side of her face." He continued striking her and then choked her and threw her against the basement wall. When she started falling to the floor, he grabbed her by the throat, "squeezed very, very hard," and threw her to the floor. Ms. Rogers was "semi-conscious [and] moaning" and he grabbed her at the waist. When he pulled on her limp body, "a sweater type . . . of thing . . . came up, and . . . he could see her brassiere." She must have thought he was going to rape her because "all of a sudden she reached . . . upward into his groin area . . . and squeezed hard." He then removed a knife from his boot and thrust it "in an upward fashion . . . into her chest and that was how he killed her."

King directed Becky to drive Ms. Rogers' car to a nearby shopping mall and said he would be right behind her. When King reached the mall, he "wiped down" Ms. Rogers' car to remove any fingerprints. He and Becky then left the mall in the van and thereafter cashed the checks forged on Ms. Rogers' account and pawned the ring stolen from her.

At trial, King took the witness stand in his own behalf. In contradiction of almost everything he had said earlier, he testified that the reason for the meeting at the vacant house was "[s]o that Becky could get the money [Ms. Rogers] owed her" for an outstanding drug bill. He claimed that Ms. Rogers had agreed to pay the bill for her son.[2] He said that when Becky returned from getting a cigarette, she conversed with Ms. Rogers some five or six feet away from where he stood. Becky then told him Ms. Rogers had said "the money is in the damn bank, she can't get it out because if she writes the check her husband is going to realize the money is gone [and] would be [angry]." King said "well, [if] she thinks he's going to be [angry], watch this."

King "walked by [Ms. Rogers] and . . . turned around and . . . grabbed her . . . with [his] left arm around [her] neck and . . . swung her around to where her head hit the wall." He continued striking her and shoving her into the wall until "she quit trying to get up." He then went upstairs "[t]o go through [Ms. Rogers'] pocketbook," found her checkbook, "started writing checks [and] wrote out three." Hearing a noise downstairs, he returned to the basement and found Becky "standing there with a knife in her hand and [Ms. Rogers] laying over against the other wall [with] blood coming [from] her stomach."

King testified that to "make it look like somebody robbed [Ms. Rogers]," he pulled a necklace from her neck. He denied, however, that he removed other items of jewelry.

King denied stabbing Ms. Rogers, and he said he told Lilley he had stabbed her because he thought it was "the only way to save [Becky] from the electric chair." He admitted writing to Becky, however, and telling her that she was innocent and that he would not see "them punish [her] for nothing."

An autopsy revealed that Ms. Rogers had been stabbed twice in the chest. One stab wound went through the skin and struck a rib. The second went into the chest itself and through the lung, cutting at least one of the major coronary arteries and continuing all the way through the chest and terminating "right beneath the skin." This second wound was fatal and, in the opinion of the medical examiner, could have been inflicted by a knife with a serrated

[2] At trial, Ms. Rogers' son testified that he had never used drugs, had never bought drugs from King or Becky, and had never owed King or Becky money for drugs or anything else. He also testified, along with other witnesses, that Ms. Rogers did not use or deal in drugs.

edge. A knife with a serrated edge was found in the van occupied by King and Becky when they were arrested.

Ms. Rogers' body bore bruises in "a horseshoe pattern" on the back of the head. An impressions expert determined that at least six impressions on the back of Ms. Rogers' head were made by the heels of King's boots or others exactly like them.

Other bruises found on the body were consistent with a blow from a blunt object such as a board or with the victim being "slammed" into a board, wall, or floor. Deep scratches or claw marks on the neck, consistent with finger nail marks, indicated the victim had been choked. Bruises on the left ring finger and right ear were consistent with the forcible removal of a ring and an earring, respectively.

King argues that the evidence "shows a situation where both [King and Becky] were equally involved in setting up the fatal encounter and willingly participating in it." Hence, King says, "the evidence left the ultimate question of who inflicted the fatal wound very much open to uncertainty and speculation."

█ When, however, we view the evidence in the light most favorable to the Commonwealth, as we must, there remains no uncertainty or speculation about the proposition that King was the "trigger man" in the murder of Ms. Rogers. The jury was free to reject King's trial testimony that Becky stabbed Ms. Rogers and to accept, instead, his earlier statement made to the Ohio police that he was the one they wanted, his written "I did [it]" admission made to Lilley, and his "cut the b____ s____, I stabbed Carolyn Rogers to death" confession made to Lilley, Gregory, and Harris.

█ At all times except his latter-day assertion at trial that Becky did the stabbing, King protested Becky's innocence vehemently, both orally and in writing. All in all, we think the evidence overwhelmingly establishes that it was King, and not Becky, who inflicted Ms. Rogers' fatal wound.

█ We can make much the same observation about the evidence of premeditation. In the first place, if, as King asserted more than once, Ms. Rogers' killing was a murder-for-hire, the element of premeditation would have been conclusively established. But aside from that, the record shows beyond doubt that King, a much larger person than the victim and armed with a knife concealed in his boot, lured Ms. Rogers to an empty house with the motive to rob her and for the purpose of concealing the

crime and the victim until he could escape. He then made a viciously brutal attack upon her, including striking and stomping her repeatedly and stabbing her twice with a knife. Leaving her dead in a pool of blood, he "wiped down" her car to remove evidence that would link him to the victim, calculatingly cashed in on the fruits of his crime, fled the state, and then, unremorsefully, pointed the finger of guilt at a woman he professed to love.

In *Epperly* v. *Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982), we said that in determining whether premeditation and deliberation exist, the jury may consider several factors: (1) "the brutality of the attack, and whether more than one blow was struck"; (2) "the disparity in size and strength between the defendant and the victim"; (3) "the concealment of the victim's body"; and (4) "the defendant's lack of remorse and [his] efforts to avoid detection." *Id.* at 232, 294 S.E.2d at 892-93. We also noted in *Epperly* that "[w]hile motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent." *Id.*, 294 S.E.2d at 893.

All these factors, including motive, are present in the instant case. Accordingly, we hold that the evidence amply supports the jury's finding that the killing of Ms. Rogers was deliberate and premeditated.

## PAROLE ELIGIBILITY

King contends the trial court erred in refusing to admit testimony in the sentencing phase of the trial which would have shown that he would not be eligible for parole until he had served at least thirty years of a life sentence. Citing *Skipper* v. *South Carolina*, 476 U.S. 1 (1986), King argues that such testimony constitutes evidence which might serve " 'as a basis for a sentence less than death.' " *Id.* at 5 (quoting *Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978)).[3] Refusal to admit the testimony, King maintains, was violative of art. I, § 8 of the Virginia Constitution, Va. Code § 19.2-264.4 (evidence which may be admissible in capital case includes facts in mitigation of offense), and the Eighth and Fourteenth Amendments of the United States Constitution.[4]

---

[3] *Skipper* did not involve any question relating to parole ineligibility.

[4] The refusal to admit evidence of parole eligibility is not violative of the United States Constitution. *Peterson v. Murray*, 904 F.2d 882, 886-87 (4th Cir.), *cert. denied*, ____ U.S. ____, 111 S.Ct. 537 (1990).

In an unbroken line of capital cases beginning with *Stamper* v. *Commonwealth*, 220 Va. 260, 278, 257 S.E.2d 808, 821 (1979), *cert. denied*, 445 U.S. 972 (1980), and continuing to *Yeatts* v. *Commonwealth*, 242 Va. 121, 126-27, 410 S.E.2d 254, 257-58 (1991), this Court has held that parole is not a proper matter for consideration by a jury. King, however, cites a number of our previous decisions and states that, in each, "the parole evidence ruled inadmissible was the defendant's eligibility for parole at some future unspecified date." Here, King says, he sought to present "evidence of parole ineligibility." He asserts there is "a critical distinction to be made between . . . telling a Jury that the Defendant might be released on parole at some future unspecified time and telling a jury that under no circumstances could the Defendant be considered for parole for at least thirty (30) years."

We disagree both with King's analysis of our previous decisions and his argument concerning a distinction between parole eligibility and parole ineligibility. In several of the cases cited by King, the defendants sought to place the question of parole ineligibility before the jury. For example, in *Watkins* v. *Commonwealth*, 238 Va. 341, 385 S.E.2d 50 (1989), *cert. denied*, 494 U.S. 1074 (1990), "defense counsel requested the [trial] court's permission to 'discuss with the jury the parole eligibility for [his] client so that they would know he would be in the penitentiary for a minimum . . . of twenty years.'" *Id.* at 351, 385 S.E.2d at 56.

The defendant in *Watkins* invited this Court to change its position on the question of the propriety of evidence or instructions "informing the jury of a defendant's parole eligibility in the event of a life sentence." *Id.* The Court said it would "decline the invitation," and we reaffirm that decision. *Id.*

## PASSION AND PREJUDICE — EXCESSIVENESS AND DISPROPORIONALITY

In a capital case, this Court is required to consider and determine whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," Code § 17-110.1(C)(1), and whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," Code § 17-110.1(C)(2). King's entire argument on these matters is quoted from his brief as follows:

The penalty of death was excessive in this case in light of King's lack of prior record of violence and criminal conduct which resulted in injury to others. In addition, King's prison record reflected that he had adjusted fairly well to prison life and was not a future threat to society.[5]

King's co-defendant, Becky Hodges King, received five consecutive twelve month sentences as a result of her involvement in the cases at issue herein.

The gross disparity between the sentence imposed upon King's co-defendant, Becky Hodges King, underscores the excessiveness of the Jury's verdict in this case and clearly supports the conclusion that the Jury's recommendation of death in this case was the result of passion, prejudice [or] other arbitrary factors.

The evidence submitted at the sentencing hearing shows that prior to 1976, King's criminal record consisted of a conviction for contributing to the delinquency of a minor. In 1976, he was arrested in Buckingham County for carrying a concealed weapon when he was found with a .25 caliber automatic pistol on his person, "fully loaded, [with] one in the chamber." He was convicted of the weapons charge, but a companion offense of possession of stolen property was nolle prossed when it was discovered he was involved in more serious offenses in Powhatan County.

In the latter county, King was charged with the 1975 robbery of the Bank of Powhatan. In that case, King abducted the bank manager at the point of a gun and forced him to drive King from the scene of the robbery to an isolated location. As a result of this incident, King was convicted and sentenced for robbery, abduction, and the use of a firearm in the commission of robbery.

King was also found guilty of several parole violations. One instance involved assault and destruction of property charges, while others concerned traffic offenses and technical violations of parole rules.

---

[5] King's reference in his argument to a "future threat to society" and the recitation earlier in his brief of the provisions of Code § 19.2-264.2, which prescribe the predicates ("future dangerousness" or "vileness") necessary for imposition of the death penalty, might suggest that he questions the sufficiency of the evidence to support the "future dangerousness" predicate. However, he has not assigned error on the point and, having examined the evidence supporting both predicates, we can understand why he has not.

In 1990, King was convicted of bigamy. This conviction was based upon his marriage to Becky in January of 1989 while still married to another woman.

The record shows further that King was involved in certain unadjudicated criminal conduct. In 1976, he and two other men planned to rob a bank in Chesterfield County, and they made a fake bomb to use in forcing their way into the bank. King carried a .32 caliber pistol with him on the trip to rob the bank, but the trio abandoned the criminal scheme when "an armoured truck pulled up [with] five security guards in it, and [King] got scared." King later threatened to kill one of his co-conspirators in the frustrated bank robbery.

While imprisoned for the Powhatan bank robbery, King induced a girl friend to make drug deliveries to him in the penitentiary. He and another inmate acquired prescription forms, the other inmate filled them out, and King gave them to his girl friend to be filled.

During January 1989, King and Becky went to the home of his legal wife, Gail King. King "knocked [the] door in[,] jerked the phone out of the wall[,] threatened [Gail with] a pistol [and] shot it up in the air."

During various periods of incarceration under the supervision of the Virginia Department of Corrections, King was found guilty of several institutional violations. These included unauthorized possession of United States currency in 1978, refusal to work, possession of drug paraphernalia, and possession of intoxicants in 1981, possession of marijuana in 1990, and being under the influence of intoxicants in 1990.

Finally, while a trusty at the Franklin County jail in 1982, King was convicted of four offenses of petit larceny. Each offense consisted of the theft of county property having a value of less than $200.

We think this evidence belies King's assertion that he lacks a record of violent criminal conduct, contradicts his claim that he adjusted to prison life to the extent that he did not constitute a future threat to society, and, hence, negates two of the legs upon which he bases his charge of excessiveness. The other leg, *viz.*, that a comparison of King's sentence with the punishment imposed upon Becky establishes the excessiveness and disproportionality of his death sentence, is one upon which King simply cannot stand.

A similar claim of excessiveness and disproportionality based upon disparity of a confederate's sentence was made and rejected in *Stamper* v. *Commonwealth, supra.* There, this Court said:

> We cannot fairly determine whether a death sentence is excessive or disproportionate by comparing it with sentences imposed upon convictions [of a confederate] for lesser included offenses, reached perhaps by compromise verdicts, even where there may be similarities in the evidence. The test is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant.

220 Va. at 283-84, 257 S.E.2d at 824.

Nor does the disparity in sentences involved in this case demonstrate, as King argues, that his sentence was "the result of passion, prejudice [or] other arbitrary factors." While Becky initially was charged with capital murder, she was not tried for that offense but for first degree murder, and she was convicted as an accessory after the fact. Any comparison of King's sentence with hers, therefore, would amount to a comparison of apples and oranges.

But, aside from what King argues, our independent examination of the record reveals nothing to indicate that the jury's sentence of death was the result of passion, prejudice, or other arbitrary factor, Code § 17-110.1(C)(1), or that the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, Code § 17-110.1(C)(2). On the subject of proportionality, the test, as indicated in *Stamper*, is whether juries in this jurisdiction generally impose the death sentence for criminal conduct similar to that of the particular defendant whose case is being reviewed. 220 Va. at 283-84, 257 S.E.2d at 824.

In making our proportionality review in a case where, as here, the jury has found the existence of both the "future dangerousness" and "vileness" predicates, we review the records of all capital murder cases previously reviewed by this Court in which the death sentence was based upon both predicates. After considering those records, as well as cases where life imprisonment was

imposed, we have no hesitancy in saying that King's death sentence is not disproportionate to sentences generally imposed by other sentencing bodies in this jurisdiction. *See George* v. *Commonwealth*, 242 Va. 264, 284-85, 411 S.E.2d 12, 24 (1991), for a collection of the previous cases involving imposition of the death sentence based upon both "future dangerousness" and "vileness."

Finding no error in any of the rulings questioned by King and no other reason to disturb the sentence of death, we will affirm each of the five convictions and sentences involved in this appeal.

*Affirmed.*