CALVIN EUGENE SWANN

v.

COMMONWEALTH OF VIRGINIA

Record Nos. 931434 and 931435

February 25, 1994

Present: All the Justices

*Lawrence D. Gott (Phyllis Marie Mosby,* on brief), for appellant.
*Donald R. Curry, Senior Assistant Attorney General (Stephen D. Rosenthal, Attorney General,* on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

On November 7, 1992, Conway Forrest Richter was shot and killed at his home in Danville. Six weeks later, Calvin Eugene Swann was indicted for the following crimes arising from that homicide: (1) capital murder in the commission of a robbery while armed with a deadly weapon; (2) robbery; (3) burglary; (4) use of a sawed-off shotgun during the robbery; and (5) possession of a firearm after a previous felony conviction.

At trial on the capital murder and robbery charges, a jury found Swann guilty of both crimes and fixed his punishment for the robbery at life imprisonment. In the second phase of the bifurcated capital murder trial, the jury fixed Swann's punishment at death, upon a finding of "future dangerousness." Code § 19.2-264.4. After considering a probation officer's report and hearing additional argument, the court imposed the sentences fixed by the jury on both charges.[1]

Swann is before this Court for automatic review of his death sentence, Code § 17-110.1(A), and we have consolidated that review with the appeal of his capital murder conviction. Code § 17-110.1(F). Also, we have certified Swann's appeal of his robbery conviction from the Court of Appeals, transferring jurisdiction over that appeal to this Court pursuant to Code § 17-110.1(A), thereby consolidating the robbery and capital murder appeals.

Since the Commonwealth prevailed in the trial court, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth. *Mueller v. Commonwealth,* 244 Va. 386, 390, 422 S.E.2d 380, 383 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1880 (1993); *Cheng v. Commonwealth,* 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

## EVIDENCE

On November 6, 1992, Calvin Eugene Swann and Melvin Frazier, Jr., were looking for someone to rob. However, they abandoned the plan.

The next night, Swann wanted to "shoot" cocaine and needed money to buy it. Arming himself with his shotgun, Swann left his house in search of a "house to rob." Because Swann had encountered physical resistance from a victim of one of Swann's prior burglaries,

---

[1] Following sentencing on the capital murder and robbery convictions, the court sustained the Commonwealth's nolle prosequi motion on the remaining three charges.

Swann felt that he needed the shotgun as protection in his planned robbery.

As Swann roamed the streets of Danville near 10:00 p.m., he walked past Richter's house and noticed the front door was open. Wearing a face mask and carrying his shotgun, Swann opened the storm door, entered the living room, and saw Richter seated at his kitchen table eating supper. Swann pointed the shotgun at Richter and said, "This is a stickup."

According to Swann, Richter got up from the kitchen table and charged toward Swann, who "duck[ed] down a little bit to aim, then . . . aimed and shot [Richter]" from a distance of eight to ten feet. Although Richter was struck in the center of his chest and bled profusely, he kept coming toward Swann, grabbed him, and pushed him out the front door.

After Richter collapsed on the front porch, Swann went through Richter's pockets, removed approximately $60 from Richter's wallet, and fled. Swann attempted to destroy the evidence of his involvement in Richter's murder by washing his bloody jacket and shotgun, throwing away other bloody clothes, and hiding the shotgun.

Although Richter died within 30 minutes of being shot, his body was not discovered until the next morning. Finding shotgun pellets embedded in Richter's chest, the police began looking for a shotgun and discovered that on November 30, Swann had sold his shotgun to Sherman Douglas Lee.

On December 22, after obtaining Swann's waiver of the rights articulated in *Miranda v. Arizona,* 384 U.S. 436 (1966), David L. Dalton, a Danville police detective, interviewed him in the city jail where Swann was serving a sentence imposed on other charges. Initially, Swann denied having or selling a shotgun. However, after Dalton revealed police information inconsistent with Swann's denial, Swann changed his story. In his first written statement, Swann admitted that he had sold his shotgun to Lee, but denied knowledge of these crimes. Swann suggested that if there were any bloody clothes at his house, those clothes could have been worn by Frazier, who knew that Swann had the shotgun and who "got caught with some of [Swann's] shells."

Shortly after Swann signed this statement, Dalton tried to provoke a reaction from Swann by telling him that the police were planning to conduct scientific experiments on some of the physical evidence found at the scene. Dalton also advised Swann that a so-called "Retinal Image Machine" was being developed which would reflect the "last impression or vision" that a dead person had seen. However, Swann did not react, nor did he retract his written statement.

According to Dalton, Swann became "defensive" when Dalton later told Swann the police (1) knew that Swann had told another person that he had killed Richter, (2) knew that Swann had washed his bloody clothes shortly after killing Richter, and (3) "had enough to prove that he did commit the murder and if there was a robbery involved that it would be capital murder and . . . he could get death." Swann asked Dalton what the courts would do with him if he were found to have a mental problem and whether he "could get the electric chair if he was found mentally insane." After some discussion of Swann's prior confinements in a mental institution, Swann finally confessed to killing Richter and agreed to "tell [Dalton] about it." The substance of Swann's subsequent written account of Richter's robbery and murder is contained in the preceding statement of the evidence.

After indictment, on Swann's motion, the court appointed Dr. Stanton E. Samenow, a clinical forensic psychologist, to examine Swann and assist in his defense. Following Dr. Samenow's examination, Swann gave the notice required by Code § 19.2-264.3:1(E) that he would present the testimony of an expert witness to support a claim in mitigation if he should be convicted of capital murder. Accordingly, on the Commonwealth's motion, the court appointed Dr. Arthur Centor, another clinical forensic psychologist, to evaluate Swann concerning "the existence or absence of mitigating circumstances relating to [Swann's] mental condition at the time of the offense." Code § 19.2-264.3:1(F). Both psychologists and Dr. Miller M. Ryans, a psychiatrist called as a witness by Swann, testified during the sentencing phase of the trial.

## ISSUES PREVIOUSLY DECIDED

Swann raises legal issues that we have previously decided adversely to his contentions. Swann advances no persuasive reasons to modify our views, and we perceive none. Therefore, we adhere to our previous rejection of these contentions and will not discuss them beyond citing representative cases in which the contentions were expressly rejected. These contentions are:

A. Capital murder defendants are constitutionally entitled to extra peremptory challenges of jurors. Rejected in *Beavers v. Commonwealth*, 245 Va. 268, 273, 427 S.E.2d 411, 416, *cert. denied*, ___ U.S. ___, 114 S.Ct. 171 (1993); *Stewart v. Commonwealth*, 245 Va. 222, 229, 427 S.E.2d 394, 399, *cert. denied*, ___ U.S. ___, 114 S.Ct. 143 (1993); *Quesinberry v. Commonwealth*, 241 Va. 364, 371, 402 S.E.2d 218, 223, *cert. denied*, 502 U.S. ____, 112 S.Ct. 113 (1991); and

*Buchanan v. Commonwealth,* 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), *cert. denied,* 493 U.S. 1063 (1990).

B. Capital murder defendants have a constitutional right to individual and sequestered *voir dire* of prospective jurors. Rejected in *Stewart v. Commonwealth,* 245 Va. at 229, 427 S.E.2d at 399, and *Fisher v. Commonwealth,* 236 Va. 403, 410-11, 374 S.E.2d 46, 50 (1988), *cert. denied,* 490 U.S. 1028 (1989).

C. The capital murder and death penalty statutes in Virginia are unconstitutional in the following respects:

1. The provisions for penalty phase instructions inadequately inform the jury regarding its consideration of mitigation evidence. Rejected in *Satcher v. Commonwealth,* 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct 1319 (1993), and *Watkins v. Commonwealth,* 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), *cert. denied,* 475 U.S. 1099 (1986).

2. The "future dangerousness" predicate of Code § 19.2-264.4 is impermissibly vague. Rejected in *Stewart,* 245 Va. at 229, 427 S.E.2d at 399-400, *Satcher,* 244 Va. at 227, 421 S.E.2d at 826, and *M. Smith v. Commonwealth,* 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), *cert. denied,* 441 U.S. 967 (1979).[2]

3. The statutory scheme impermissibly allows admission of evidence of unadjudicated crimes in the sentencing phase without requiring proof of the commission of those crimes beyond a reasonable doubt. Rejected in *Satcher,* 244 Va. at 228, 421 S.E.2d at 826, and *Stockton v. Commonwealth,* 241 Va. 192, 210, 402 S.E.2d 196, 206, *cert. denied,* 502 U.S. ___, 112 S.Ct. 280 (1991).

4. The statutory scheme impermissibly permits admission of hearsay evidence in the probation officer's post-sentence report. Rejected in *O'Dell v. Commonwealth,* 234 Va. 672, 701-702, 364 S.E.2d 491, 507-508, *cert. denied,* 488 U.S. 871 (1988).

5. The statutory appellate review procedures for death penalty cases, as written and as applied, violate a defendant's constitutional rights. Rejected in *Satcher,* 244 Va. at 228, 421 S.E.2d at 826, and *Smith v. Commonwealth,* 239 Va. 243, 253, 389 S.E.2d 871, 876, *cert. denied,* 498 U.S. 881 (1990), *cert. denied,* ___ U.S. ___, 113 S.Ct. 142 (1992).

---

[2] We do not consider Swann's contention relating to the "vileness" factor of the statute because that contention is rendered moot on appeal by the verdict based only on the "future dangerousness" predicate of the statute. *Fisher,* 236 Va. at 414, 374 S.E.2d at 53.

D. The trial court violated Swann's constitutional rights in excluding evidence and argument that, should the jury impose a life sentence, Swann probably would not be released on parole for at least 21 years. Rejected in *Ramdass v. Commonwealth,* 246 Va. 413, 426, 437 S.E.2d 566, 573 (1993), and *King v. Commonwealth,* 243 Va. 353, 367-68, 416 S.E.2d 669, 677, *cert. denied,* ___ U. S. ___, 113 S.Ct. 417 (1992).

## ISSUES PROCEDURALLY DEFAULTED

Swann assigns error to a number of trial court rulings to which he failed to make the objections required by Rule 5:25. Rule 5:25 provides in pertinent part:

Error will not be sustained to any ruling of the trial court . . . before which the case was initially tried unless the objection was stated with reasonable certainty at the time of the ruling.

Swann voiced no objection to the actions of the court complained of in his assignments of error 3, 11, 15, and 23.[3] And, although Swann objected to the court's refusal to admit a post-trial letter from Dr. Samenow in evidence, he assigned no grounds for his objection, asserted for the first time in assignment of error 29. Further, although Swann assigned grounds for his objection to other rulings of the court, these objections were not based on the constitutional grounds that he asserts for the first time in his assignments of error 19, 20, 21, 22, and 24.[4] Thus, we will not consider any of these 10 assignments of error. Rule 5:25.

---

[3] Assignments of error 3, 11, 15, and 23 involve, respectively, the trial court's: (1) failure to advise Swann that his noncooperation with Dr. Centor could result in the exclusion of the testimony of Swann's mental health expert; (2) dismissal of prospective juror Lloyd B. Jennings from the jury panel; (3) delay in requiring the jurors to return copies of the transcript of Dalton's taped interview with Swann that were made available for the jurors to read as the tapes were being played; and (4) interruption of closing argument of Swann's counsel that Swann "can do the rest of his life in prison, under a life sentence by you," by permitting the Commonwealth to approach the bench to object and by subsequently instructing the jury to disregard this argument.

[4] Assignments of error 19, 20, 21, and 22 involve, respectively, the court's admission of the following evidence:

(1) Holland's description of the burglary that Swann claimed to be the justification for arming himself with a shotgun before robbing Richter; (2) a witness's statement that Swann's prior release on parole was a mandatory release; and (3) on cross-examination of Dr. Ryans, admission of hearsay information and his explanation of information that was inserted on medical records after he had examined and treated Swann.

Admitting that he made no objection to the allegedly improper actions of the Commonwealth described in assignments of error 8, 18, and 25, Swann argues that the court should have noticed these errors sua sponte. Assignments of error 8 and 25 involve the Commonwealth's statements made to three members of the venire and in closing argument.[5] Assignment of error 18 involves the Commonwealth's evidence, submitted during its case in chief, of Swann's future dangerousness through the direct examination of Dr. Centor. Swann argues that Dr. Centor based a part of his opinion upon statements Swann made during his examination by Dr. Centor, the Commonwealth's mental health expert. This, Swann contends, was in violation of Code § 19.2-264.3:1(G), providing in pertinent part that "[s]uch statements or disclosures shall be admissible in rebuttal only when relevant to issues in mitigation raised by the defense."

■ In our opinion, Swann had the burden of making the proper objections to these actions of the Commonwealth, and was not entitled to rely upon the trial court to notice the alleged error sua sponte. Accordingly, we will also apply the provisions of Rule 5:25 to these objections.

## PRETRIAL PHASE

### Suppression Motion

Swann moved the court to suppress his statements to Dalton for the following reasons: (1) the waiver of his *Miranda* rights was not "knowing, voluntary [or] intelligent," (2) his statements were involuntary because the police "took advantage of [his] mental disabilities and the fact he was sick as a result of his cocaine addiction," and (3) the police did not stop the interrogation after he requested counsel. At a pretrial hearing of this motion, the Commonwealth presented testimony of Dalton, Detective Jackson H. Brown, and Dr. Centor, tape recorded transcripts of Swann's interviews with law enforcement offi-

---

Assignment of error 24 involved the action of the court in permitting the Commonwealth to respond to Swann's closing argument that he would spend the rest of his life in prison under a life sentence by stating in rebuttal argument that "the Commonwealth denies the accuracy of that statement."

[5] During *voir dire* examination of venireman Dudley Clayton regarding the death penalty, the Commonwealth stated that "you wouldn't necessarily be taking a life . . . you'd just be making a decision . . . about the evidence." In closing argument in the penalty phase, the Commonwealth referred to Swann's invocation of his constitutional rights after Swann had voluntarily answered some questions in the investigation of the Holland burglary.

cials, and Swann's written statements. Swann presented no evidence in support of his motion, which was denied.

■ The principles that guide us in reviewing the trial court's denial of the suppression motion are well settled.

A defendant's waiver of his *Miranda* rights is valid when the waiver is made knowingly, voluntarily, and intelligently. While the question whether a statement is voluntary is ultimately a legal rather than a factual one, subsidiary factual determinations are entitled to a presumption of correctness. The test for voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961). When determining whether a defendant's will has been overborne, the totality of the circumstances must be examined, including the defendant's experience and background as well as the conduct of the police.

*Jenkins v. Commonwealth,* 244 Va. 445, 453-54, 423 S.E.2d 360, 366 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1862 (1993).

■ Tested by these principles, the record amply supports the court's holding that Swann's waiver was made knowingly, voluntarily, and intelligently. Swann, a high school graduate who had attended one semester of college, was no stranger to the judicial system. He had waived his *Miranda* rights on a number of occasions in which he had been questioned about crimes he had previously committed. Indeed, during the investigation of the Holland burglary, after Detective Brown informed Swann that his statements "couldn't be true," Swann stopped the questioning by stating that he wanted to remain silent until his court appearance.

Swann's counsel contends that Swann's December 22 statement was involuntary because at that time, he was "a schizophrenic strung-out cocaine addict who used coke every day." However, the court could have found from the evidence that Swann was not schizophrenic and that he had not used cocaine for 30 days, since he had been incarcerated during that period. Dr. Centor testified that, in his opinion, Swann was not schizophrenic.

Further, Dalton, who was familiar with people experiencing withdrawal symptoms of cocaine dependency, such as sweating or fidgeting, saw no evidence of this during any of his interviews with Swann. Indeed, Dalton testified that "the only thing that I gathered

from him [was that] he was a lot smarter and more conniving than [a] lot of folks I've dealt with."

■ Swann also claims that his confession was inadmissible because it was obtained as a result of a "lie by Dalton" in describing the development of the "Retinal Image Machine." However, a police officer's misrepresentation during interrogation will not invalidate a confession unless it causes a suspect to make a confession he otherwise would have withheld. *M. Smith v. Commonwealth,* 219 Va. at 470, 248 S.E.2d at 144-45; *see Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (police misrepresentation that accomplice confessed does not make otherwise voluntary confession inadmissible). Dalton's uncontradicted testimony was that Swann did not react to the story about the machine. Further, Dalton testified that Swann did not admit that he had killed Richter until nearly an hour later, when Swann was advised of the information the police possessed and of the possibility that he would be charged with capital murder. This evidence sufficiently supports the trial court's implicit finding that Dalton's information about the "Retinal Image Machine" was not the cause of Swann's confession.

■ Finally, because there was no evidence that Swann had asked for an attorney before or during any of the police interviews, we reject his contention that he did make such a request. For these reasons, we find no error in the trial court's refusal to suppress Swann's statements.[6]

*Appointment of Second Mental Health Expert to Assist Swann*

Swann assigns error to the court's failure to appoint

> a psychiatrist as a mental health expert for further evaluation on the issue of schizophrenia and medications to further examine issues raised in the court-ordered evaluation and to assist in the presentation of mental health mitigation issues.

Dr. Samenow, the mental health expert appointed by the court to assist Swann, indicated that Swann had a mental illness with "aspects of schizophrenia," but that some symptoms "cleared up" with medication. Following Dr. Samenow's examination and diagnosis, Swann moved the court to appoint a psychiatrist at state expense "for further

---

[6] Because we hold that the evidence supports the trial court's finding that Swann's waiver of his *Miranda* rights on December 22 was a voluntary waiver, we need not consider Swann's claim that his subsequent waivers of his *Miranda* rights were invalid because the "cat was out of the bag."

evaluation on the issue of schizophrenia as it relates to the Defendant and medications for said disease and the effects of medications upon the Defendant." Swann contended that because Dr. Samenow was not a psychiatrist, he was not qualified to make such an evaluation. Noting the availability of Dr. Ryans, a psychiatrist at Central State Hospital who had previously treated Swann, Swann suggested his appointment. Swann assigns error to the court's refusal to appoint Dr. Ryans.

Dr. Samenow did not testify that he was unable to assess the effect of medication upon patients with schizophrenia; to the contrary, he testified that Swann's medical record showed his mental condition had been successfully controlled with medication. And Dr. Ryans, testifying on behalf of Swann, agreed with Dr. Samenow's opinion that Swann's symptoms of mental illness had "clear[ed] up" during Dr. Ryans's prior treatments when Swann took those medications. Accordingly, although the statute authorizes the court to appoint a second mental health expert, the statute does not require such appointment, and we find no abuse of discretion in the court's denial of Swann's motion. *Mackall v. Commonwealth,* 236 Va. 240, 247, 372 S.E.2d 759, 764 (1988), *cert. denied,* 492 U.S. 925 (1989); *Pruett v. Commonwealth,* 232 Va. 266, 276, 351 S.E.2d 1, 7 (1986), *cert. denied,* 482 U.S. 931 (1987).

Even so, Swann contends that he was prejudiced in presenting his mitigation evidence because Dr. Ryans, who had last seen and treated him in 1985, "was without benefit of a recent examination to present Swann's current status." Dr. Ryans testified that he had examined and treated Swann in Central State Hospital on at least six occasions for schizophrenia from March 1981 until June 1985. Although Dr. Ryans described schizophrenia as "a lifelong disease" and mentioned that Swann exhibited some characteristic symptoms, he also testified that schizophrenia can be controlled by medication.

Swann suggests nothing to indicate that Dr. Ryans's testimony might have changed if he had performed a recent examination of Swann. Nor did Swann ask the court to hear Dr. Ryans in chambers to ascertain whether the lack of a current examination affected Dr. Ryans's opinion in any way. Accordingly, we find no merit in this argument.

## SELECTION OF JURY

Swann claims that his equal protection rights under the Fourteenth Amendment of the Constitution of the United States were violated by

the Commonwealth's peremptory strikes of two prospective jurors, Judith M. Brown and Moses R. Hankins, who were black. Recently, we stated the controlling principles as follows:

> In *Batson v. Kentucky,* 476 U.S. 79, 89 (1986) the Supreme Court ruled that purposeful discrimination based upon race in selecting jurors violates the Equal Protection Clause. Once an accused makes a *prima facie* showing of such purposeful discrimination, a prosecutor must give a reasonable explanation in rebuttal, showing that his reason for a peremptory strike was race neutral. Id. at 93-94. If the prosecutor's reason is based upon factors other than a juror's race, it is deemed to be race neutral. *Hernandez v. New York,* [500 U.S. 352], 111 S.Ct. 1859, 1866 (1991). To constitute an equal protection violation, discriminatory intent must be inherent in the prosecutor's explanation. *Id.* A trial court's determination whether the reason is race neutral is entitled to great deference. *Spencer v. Commonwealth,* 238 Va. 295, 310, 384 S.E.2d 785, 795 (1989), *cert. denied,* 493 U.S. 1093 (1990). The determination will not be reversed on appeal unless it is "clearly erroneous." *Hernandez,* [500] U.S. at ___, 111 S.Ct. at 1871.

*Wright v. Commonwealth,* 245 Va. 177, 186, 427 S.E.2d 379, 386 (1993).

■ Applying these principles, we find no error in the trial court's determination that the reasons given for these peremptory strikes were race neutral. The Commonwealth's Attorney explained that he struck Brown from the panel because of her admission on *voir dire* examination that in a previous criminal case, her preference for a lighter sentence had resulted in a compromise verdict. Clearly, this explanation sufficiently supports the trial court's finding that Brown was not struck from the panel because of her race.

One of the Commonwealth's explanations for striking Hankins from the panel was Hankins's statement that he probably would vote for a life sentence rather than the death penalty if there was evidence that the defendant had been mentally ill. This is a racially neutral reason for striking Hankins. *See Wright,* 245 Va. at 187-88, 427 S.E.2d at 386-87 (prospective juror's equivocal answers regarding imposition of death penalty gave rise to racially neutral reason for peremptory strike). And we do not agree with Swann's assertion that the Commonwealth's prolonged questioning of Hankins regarding his attitude toward the death penalty was "suggestive of bias or intent to

discriminate." Our review supports the trial court's implicit finding that these questions reflect no such bias or discriminatory intent.

## GUILT PHASE

*Use of Photographs, Video Tape, and View*

Swann complains of prejudice in the admission of photographs and a video tape of the crime scene and the victim, coupled with a view of the premises. He asserts that the photographs and video tape "depict especially graphic or horrific scenes," tending to "distract the jury from the matter at hand and inflame their passions." Swann also argues that "the only purpose [of the view] was to humanize the victim."

██ Photographs and video tapes of crime scenes are admissible to show "motive, intent, method, malice, premeditation and the atrociousness of the crimes." *Spencer v. Commonwealth,* 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), *cert. denied,* 493 U.S. 1093 (1990). And the use of photographs and a view of the crime scene to enable the jury to understand what happened at a crime scene is a matter within the discretion of the trial court. *Quesinberry,* 241 Va. at 378, 402 S.E.2d at 226-27.

Swann was the only living witness to Richter's murder. In his statements to the police, Swann implied (1) that he had shot Richter at close range solely to protect himself from imminent harm, and (2) that Richter grabbed him in the living room and pushed him out the front door. However, the photographs and video tape show that Richter may have been shot near the kitchen entry into the living room. There were no signs of struggle in the 13-foot distance between the threshold of the front door and the kitchen door. The photographs and video tape of the small, furniture-filled living room and Richter's 350-pound body, as well as the view, could have assisted the jury in understanding the crime scene and in determining the distance between the two men when Swann shot Richter. Accordingly, we find no abuse of discretion in the trial court's rulings regarding this evidence and the view.

*Sufficiency of Evidence of Capital Murder and Robbery*

Swann contends that the evidence is insufficient to show that his act of killing Richter was "willful, deliberate and premeditated." We disagree.

 The evidence that Swann (1) armed himself before looking for a "house to rob," (2) entered Richter's house wearing a mask, and (3) aimed and fired the weapon at Richter when Richter charged him, amply supports the verdicts. *Barnes v. Commonwealth,* 234 Va. 130, 136, 360 S.E.2d 196, 201 (1987), *cert. denied,* 484 U.S. 1036 (1988) (evidence that armed masked burglar shot persons who resisted sufficient to show willful, deliberate, and premeditated killings). Nor was the jury required to accept Swann's claim in one of his confessions that Richter "charged at me and I didn't have any thing to do but shoot him." As we said in *Barnes,* "one who, armed with a deadly weapon, approaches others intending to rob them, will not be heard to assert that he was provoked by the resistance of his victims to his criminal enterprise." *Id.* at 136, 360 S.E.2d at 200.

Even if the evidence is sufficient to convict him of both crimes, Swann claims that the Commonwealth produced insufficient evidence to corroborate his confession. We disagree.

 The corroboration required is limited to the facts constituting the *corpus delicti. Watkins v. Commonwealth,* 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989), *cert. denied,* 494 U.S. 1074 (1990). And where the accused had fully confessed the crimes "only *slight* corroborative evidence is necessary to establish the *corpus delicti." Id.* at 348-49, 385 S.E.2d at 54.

 The *corpus delicti* of a homicide is proof of the victim's death from the criminal act or agency of another person. *Id.* And the *corpus delicti* of a robbery consists of evidence of violent force upon a victim coupled with evidence that property was taken from the victim. *Id.* at 349, 385 S.E.2d at 54; *see Williams v. Commonwealth,* 234 Va. 168, 175, 360 S.E.2d 361, 366 (1987), *cert. denied,* 484 U.S. 1020 (1988).

Obviously, evidence of Richter's death from a shotgun wound establishes the *corpus delicti* of his homicide. And evidence of the violence inflicted upon Richter, coupled with evidence indicating that after Richter was shot, his pants pockets were turned inside out and no money was found in his wallet, suffice to show the *corpus delicti* of Richter's robbery. Thus, there is sufficient corroborative evidence of both crimes.

## PENALTY PHASE

### *Constitutionality of Jury Instructions*

 Swann contends that the Virginia death penalty statute is unconstitutional "under both the United States and the Virginia

Constitutions" because the trial court is not required to instruct the jury that it must weigh the "aggravating factors of vileness and future dangerousness" and find beyond a reasonable doubt that they outweigh any mitigating circumstances. If the statutory sentencing procedures sufficiently guide and channel the jury's discretion so as to minimize the risk of wholly arbitrary and capricious jury action in imposing the death sentence, the "weighing instruction" is not required by the Constitution of the United States. *Zant v. Stephens,* 462 U.S. 862, 874-75, 890 (1983).

And we reject Swann's argument that the statutory form of the verdict is unconstitutional. *Watkins v. Commonwealth,* 229 Va. at 490-91, 331 S.E.2d at 438.

### *Sufficiency of Evidence of Future Dangerousness*

In November 1974, Swann, then 19 years old, pled guilty to a May 1974 robbery of fast food store employees. Swann was sentenced to 10 years in the penitentiary and was released on mandatory parole in April 1982. In September 1982, while still under parole supervision, Swann participated in a burglary and grand larceny, striking the victim before escaping. Swann pled guilty to both charges and received sentences totaling nine years. Swann was released on mandatory parole in October 1987.

In March 1989, Swann broke into Rose Marie Gibson's house at approximately 11:00 p.m. and entered her bedroom. When Gibson told Swann that she recognized him, he replied, "[Y]eah, what are you gonna to do about it," and hit her in the head with a brick. Swann fled when Gibson secured a butcher knife. Later, Swann pled guilty to assaulting Gibson and to burglary with intent to commit assault. Sentenced on the burglary conviction to a five-year confinement in the penitentiary, Swann was released on mandatory parole in January 1992.

In June 1992, while still on mandatory parole, Swann cut a chain-link fence at a local Wal-Mart store and stole six lawn mowers on two occasions within two days. In a statement to Detective Brown, who was investigating an unrelated crime, Swann admitted that within a five-day period in late October 1992, he had "taken three pocketbooks from three different ladies." Irene Harris Carter, one of those victims, testified that when she resisted, Swann shot at her with a gun and later hit her on the head with the gun.

Within 10 days after the Carter robbery, Swann robbed and murdered Richter. Less than two weeks after he murdered Richter, Swann

assaulted a police officer after being arrested for possession of cocaine.

All three mental health experts agree that Swann represented a danger to others. Nevertheless, Swann contends that when weighing the evidence of future dangerousness "against Swann's long standing history of mental illness and mental hospitalization for schizophrenia, no rational trier of fact could impose the death penalty." We disagree.

Although there is conflicting evidence whether Swann ever was schizophrenic, he was given medication for schizophrenia from 1981 through 1985. However, Dr. Centor, who examined Swann in 1989 and in April 1992, concluded that Swann was not schizophrenic.

Further, one of Swann's mental health experts, Dr. Ryans, testified that if a person suffering from schizophrenia has not taken the prescribed medication for three months, that person usually shows symptoms of the illness. Dr. Centor testified that such symptoms were usually manifestations of delusions or hallucinations, but the symptoms can also be such behavior as remaining silent and immobile. Yet, although Swann had not taken medication for schizophrenia in the nine months before Dalton's interrogation, Dalton testified that during his interrogation of Swann he saw none of the signs of schizophrenia described by Dr. Centor.

Thus, Swann overlooks Dr. Centor's opinion and evidence indicating that he was not and is not mentally ill. Additionally, after Swann was charged with Richter's murder, he told a neighbor that he was going to "play crazy" to escape the death penalty.

■ And, even if the jury found that Swann was mentally ill, it may have concluded that Swann's alleged mental illness did not mitigate his offenses. Code § 19.2-264.4(B) lists as a mitigating factor the fact that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired." And we must assume that the jury followed the court's instruction to consider "any evidence that has been presented in mitigation." *See Yeatts v. Commonwealth,* 242 Va. 121, 143-44, 410 S.E.2d 254, 268 (1991), *cert. denied,* ___ U.S. ___, 112 S.Ct. 1500 (1992) (death sentence predicated on "future dangerousness" imposed upon defendant despite mitigating evidence of mental retardation); *Hoke v. Commonwealth,* 237 Va. 303, 313, 377 S.E.2d 595, 601, *cert. denied,* 491 U.S. 910 (1989) (death sentence imposed based on "vileness" and "future dangerousness" predicates, despite evidence of defendant's prior confinement in nine or ten mental hospitals); *Giarratano v. Commonwealth,* 220 Va. 1064, 1076-79, 266 S.E.2d 94, 101-102 (1980) (death sentence predicated on "future dangerousness"

imposed by court despite mitigating evidence of defendant's "schizoid personality disturbance" and "extreme mental and emotional disturbance").

## SENTENCE REVIEW

In conformity with Code § 17-110.1(C), we review Swann's death sentence to determine whether (1) it was imposed under the influence of passion, prejudice, or any other arbitrary factor, or (2) it is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.

We have examined the records in all capital cases accumulated by this Court pursuant to Code § 17-110.1(E), paying particular attention to those cases in which the underlying felony was robbery and the death penalty was based on "future dangerousness." These cases are compiled in *Yeatts,* 242 Va. at 143, 410 S.E.2d at 267-68. Since *Yeatts,* the following additional death penalty cases involving robberies and "future dangerousness" have been decided: *Ramdass,* 246 Va. at 437, 437 S.E.2d at 573-74, and *Dubois v. Commonwealth,* 246 Va. 260, 267-68, 435 S.E.2d 636, 640 (1993). After reviewing those records, as well as the records in cases in which life imprisonment was imposed in similar cases, we conclude that the death sentence imposed upon Swann was neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes of a similar nature.

Citing no illustrative cases, Swann asserts that "[t]he death penalty is not what juries of this Commonwealth routinely impose upon defendants like Swann." According to Swann, "his history of mental health hospitalization and treatment" make his case different from other capital murder cases. Again, Swann fails to recognize that the jury may have found that he was not mentally ill. And even if the jury concluded that he was mentally ill, Swann does not articulate any essential differences between his case and cases like *Yeatts, Hoke,* and *Giarratano,* and we find none.

## CONCLUSION

We find no error in these cases, nor do we find any basis in the record to commute the death sentence to life imprisonment. Therefore, we will affirm the judgments entered in the capital murder and robbery trials.

Record No. 931434 - *Affirmed.*
Record No. 931435 - *Affirmed.*