**UNITED STATES of America, Appellee,**

v.

**Alvin O. LEGGETT, Appellant.**

**No. 95–3019.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1996.

Decided April 16, 1996.

Robert S. Becker, appointed by the court, argued the cause and filed the briefs for appellant.

Geoffrey G. Bestor, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Roy W. McLeese, III, and Suzanne G. Curt, Assistant United States Attorneys, were on the brief.

Before: SILBERMAN, BUCKLEY and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In contending that he was denied protections to which he was entitled under the Sixth Amendment, appellant Alvin Leggett makes three related claims: first, that the district court erred in allowing him to proceed *pro se* without first determining that he had knowingly and willingly waived his right to counsel; second, that because he and his trial counsel disagreed about trial strategy and counsel sought to withdraw, he was deprived of the conflict-free counsel to which he was entitled; and third, that he was denied the effective assistance of counsel when counsel failed to present his theory of the defense to the jury. The first claim misstates the trial record, which shows that Leggett did not proceed *pro se* but merely sought and received the court's permission to supplement his counsel's examination and argument. The second claim is an attempt to avoid the heavy burden under the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which Leggett cannot meet, by invoking *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), which is inappo-

site. The third claim assumes that Leggett's theory of the defense was clear and relevant, neither of which the record supports; in any event, he can show no prejudice. For these reasons we affirm the judgment of conviction.

## I.

Leggett was indicted for bribery conspiracy, 18 U.S.C. § 371, and bribery, *id.* § 201(b)(2), in connection with a three-year maintenance contract entered into by the Department of Justice in April 1986 with Maintenance Pace Setters, Inc. Leggett was the Department's contracting officer's technical representative (hereafter, "contract compliance officer"). The contract required MPS to provide 440 man-hours of work and 40 hours of supervisor work per day. If MPS did not supply the required working hours, deductions were to be assessed against the monthly contract payments to MPS. The government presented evidence that, although MPS failed to meet the man-hours requirements from the beginning of the contract, the required deductions were not assessed.

Richard Lowe, a cleaning inspector at the Department, testified that Leggett, his supervisor, directed him to add 40 man-hours per day to the monthly summaries of the hours provided by MPS under the contract. Lowe complied because Leggett told him that the additions had been "worked out" with Leggett's supervisor. This practice stopped when a new inspector took over from Lowe in 1988 and refused to add hours to MPS's monthly summaries.

Samuel Lewis, the president of MPS, explained the origin of the false reports.[1] He testified that when MPS failed to provide the man-hours required by the contract, Leggett said Lewis would either have to pay him seven or ten thousand dollars (Lewis could not remember the figure) or the Department would enforce the terms of the contract. Leggett told Lewis that it would be cheaper to pay him than to take the contract deductions. Lewis did not have enough cash readily available, and instead placed Sandra Carr, Leggett's girl-

---

[1] Lewis pled guilty to conspiracy and testified pursuant to a plea agreement.

friend and future wife, on the MPS payroll. MPS paid Carr $750 or $800 biweekly (again Lewis could not recall the exact amount) for doing almost nothing, in response to Leggett's continuing threats to make deductions from the contract payments. Lewis also testified that he paid Leggett close to seven hundred dollars on the day of their agreement, and that "to make it look good," MPS was assessed a couple of man-hour deductions after it started paying Carr. On cross-examination, Leggett's counsel brought out discrepancies between Lewis' testimony and his earlier account of the events, and elicited Lewis' admission that he had previously bribed another official in connection with a government contract. The government presented a number of witnesses to corroborate aspects of Lewis' testimony.

In defense, Leggett received the permission of the court to call two of the government's witnesses and questioned them himself and also personally testified in order to raise doubt about the bias of some witnesses and to show that the Department benefitted from having MPS continue on the job even though MPS failed to comply with the terms of its contract. Leggett elicited testimony regarding Lowe's personal conflicts with him. Witnesses also testified about other work that MPS did for the Department and the inexperience and lack of training of the Department's investigators, including Lowe. Finally, Leggett testified that Lewis, not he, was the one who had offered a $10,000 bribe, and that Leggett had rejected the offer. Leggett also explained Carr's employment by claiming that he had given Carr's business card to Lewis because Lewis had said he needed real estate services. On cross-examination Leggett admitted that he had signed the monthly receiving reports for MPS and that he was having severe financial problems at the time he allegedly demanded a bribe from Lewis.

The jury found Carr, who was indicted along with Leggett, not guilty of bribery conspiracy and aiding and abetting bribery but found Leggett guilty of bribery conspiracy. When the jury could not reach a verdict on the bribery count against Leggett, the district court declared a mistrial on that count. The court sentenced Leggett to 30 months' imprisonment, three years' supervised release, and a $50 special assessment. Following the appointment of new counsel, Leggett moved for a new trial on the ground of ineffective assistance of counsel; the court denied the motion.

## II.

▪ The principal issue in this appeal is whether the hybrid form of representation that the district court permitted at trial denied Leggett of protections to which he was entitled under the Sixth Amendment. Contrary to Leggett's contentions, he never represented himself nor sought to do so.

Leggett contends that once he alerted the district court to his concern after two days of trial that he did not think that he was receiving effective assistance of counsel, the court was required to engage him in a "short discussion on the record" regarding the "dangers and disadvantages of self-representation." *United States v. Brown,* 823 F.2d 591, 599 (D.C.Cir.1987) (quoting *United States v. Bailey,* 675 F.2d 1292, 1300 (D.C.Cir.), *cert. denied,* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982), and *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532–33, 45 L.Ed.2d 562 (1975), respectively). Having failed to do so, the district court could not determine that he had made a knowing and intelligent waiver of his right to counsel and thus erred in allowing him to cross-examine witnesses and make a closing argument to the jury.

▪ When a defendant manages his own defense at trial and thereby "relinquishes ... many of the traditional benefits associated with the right to counsel," the defendant must " 'knowingly and intelligently' forgo those relinquished benefits." *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvan-

tages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

*Id.* (quotations omitted). The district court must make clear on the record the defendant's awareness of the dangers and disadvantages of self-representation. *Bailey,* 675 F.2d at 1300.

■ By its own terms, however, *Faretta* applies only where a defendant chooses to proceed *pro se* and thereby forgoes the benefits associated with the right to counsel. "*Faretta* does not require a trial judge to permit 'hybrid' representation" and "[a] defendant does not have a constitutional right to choreograph special appearances by counsel." *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984); *see also United States v. Tarantino,* 846 F.2d 1384, 1420 (D.C.Cir.), *cert. denied,* 488 U.S. 840 & 867, 109 S.Ct. 108 & 174, 102 L.Ed.2d 83 & 143 (1988). The law presumes that a defendant has not exercised his right to represent himself nor waived the right to counsel in the absence of an articulate and unmistakable demand by the defendant to proceed *pro se. Tarantino,* 846 F.2d at 1420; *United States v. Weisz,* 718 F.2d 413, 425–26 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027 & 1034, 104 S.Ct. 1285 & 1305, 79 L.Ed.2d 688 & 704 (1984). Absent such affirmative action, the defendant waives his Sixth Amendment right to represent himself. *Weisz,* 718 F.2d at 425–26, 428.

■ The record makes clear that Leggett was advised of his options and neither waived his right to counsel nor invoked his right of self-representation. Consequently, the district court was not required by the Sixth Amendment to caution Leggett about the "dangers and disadvantages of self-representation." *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541. Instead, because the record shows that the hybrid procedure allowed by the district court responded to Leggett's concerns and to his stated preference that he be allowed to supplement his counsel's questions and argument, he has a heavy burden to show that the district court abused its discretion. *See Tarantino,* 846 F.2d at 1420; *United States v. Mosely,* 810 F.2d 93, 97–98

(6th Cir.), *cert. denied,* 484 U.S. 841, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987).

At the end of the second day of trial, after Samuel Lewis' damaging testimony, Leggett sent a handwritten note to the district court stating, "I am not, in my opinion, being competently represented. I would like to know what my options are." The next morning, the district court notified Leggett's counsel and recessed so that Leggett and his counsel could discuss the note. When the court reconvened, counsel asked to withdraw because he and Leggett were "at loggerheads" regarding trial strategy and Leggett's second guessing of counsel's examination of witnesses made it difficult to concentrate. Thereafter, the district court spoke *ex parte* and separately with Leggett and his counsel.

Leggett told the district court that he was "concerned primarily because of [counsel's] lack of [knowledge of] many incidents that took place, and because of his lack of knowledge in regards to contracts." Leggett recounted various complaints with counsel and stated that "[i]n many cases, there were areas that I wanted to try and get across to him that he seemed to not be interested in." At the same time, Leggett acknowledged that he "was very impressed" with his counsel's opening statement and was "not totally dissatisfied with his strategy, or with many of his questions."

Counsel, responding to Leggett's complaints, defended the adequacy of his pretrial preparation, pointing out that he had met with Leggett on three occasions, once shortly after counsel was appointed and twice in the days immediately before trial, but was unable to arrange other meetings because Leggett was living in Florida and had not returned to the District of Columbia until three days before trial. Counsel pointed to the limited relevance of government contracting knowledge to Leggett's case, given the futility of contesting MPS's failure to fulfill the man-hour requirement. Counsel rejected Leggett's suggestion that he should have contacted Leggett's previously retained counsel; prior counsel had limited information and knowledge about the case and therefore could be of little help. Finally, counsel explained his decision not to ask every question

of every witness that Leggett requested, seeking to avoid questions and witnesses that were immaterial and unhelpful to the case, particularly when they might "open doors" to damaging subjects. Counsel related one instance when he had asked a question that Leggett requested, and the district court interjected, "[a]nd it almost killed you." Counsel also observed that Leggett was a difficult client, and renewed his request to withdraw.

The district court found that Leggett's complaints were "untimely and inadequate to justify stopping the trial or granting a mistrial." The court stated that:

[a] complaint about inadequate trial preparation coming after the primary witness for the government has already testified and been cross-examined, and never having been presented to the Court before, is simply untimely, and I will not accept that is anything other than a strategic ploy by the defendant to avoid this trial being completed after the testimony did not go as well as he had hoped for in the cross-examination of the government's primary witness.

Any complaints that the defendant has about the cross-examination of the government's primary witness, Mr. Lewis, are not adequate in this Court's view to require the discharge of [counsel] or to indicate that [counsel] has not sufficiently performed his duty.

Whether or not [counsel] could be more knowledgeable of government contract law and more helpful to the defendant if he were, is not adequate either, because I don't think there is any other lawyer likely to be appointed for [counsel] who would have any better knowledge, or could obtain any better knowledge than [counsel] has.

The district court then advised Leggett of his constitutional right to represent himself, with or without his counsel as his standby adviser with Leggett taking the lead. The court recommended against either course as "ill advised," and urged Leggett to work with his counsel. However, the court made clear that counsel would not continue to represent

him over his objection. Leggett informed the court that he was "not interested in representing [himself]" and was "not interested in taking the lead," but rather "want[ed] clarification as to whether" he could "interject certain questions" of a technical nature if his counsel were not well-informed enough to ask them. The district court stated that he could but urged Leggett not to do so in front of the jury, but rather, out of the presence of the jury, to ask his counsel to ask them or bring them to the bench. The court explained that the suggested procedure would "work better with the jury" and give counsel a chance to advise Leggett whether it would be in his interest to ask a particular question, while preserving Leggett's ability to pose the question through the court should he persist in asking it against counsel's advice. The court reminded Leggett of the "trouble" that had resulted when counsel acceded to Leggett's insistence on a line of questioning earlier in the trial.

The trial then recommenced, and after the morning session was completed, the court held an *ex parte* conference with Leggett and his counsel to assess the arrangement. The court advised counsel of his continuing responsibility to exercise his best judgment in advising Leggett whether to ask particular questions, observing that "it's going to be difficult for any attorney with this particular client." Counsel assured the court that he understood his responsibility. Leggett responded by stating that he, too, wanted counsel to exercise his best judgment in his (Leggett's) interest, not only in evaluating Leggett's proposed questions, but also in asking the questions that counsel thought needed to be asked. This continued to be Leggett's position throughout the trial.

Still later in the trial, after several other government witnesses had corroborated Lewis' testimony, Leggett informed the district court that "there [we]re so many things that were not addressed that [he] wanted to see addressed," that he felt "obligated" to question witnesses personally.[2] The court

2. Leggett informed the court that:

I wrote [my counsel] a note before [a certain witness] began to testify to let him know that I

advised the jury of the procedure to be followed,[3] and Leggett cross-examined three government witnesses.[4] Later he posed questions to two witnesses that he called in his defense and made a closing argument to the jury following the closing argument of his counsel.[5]

The district court's accommodation of Leggett's request for a hybrid form of representation reflects a careful balancing of interests at stake. *See McKaskle*, 465 U.S. at 193–95, 104 S.Ct. at 958–60 (White, J., dissenting). The court granted Leggett's request to participate personally only after advising him of his options and ascertaining his unambiguous rejection of a desire to represent himself. The record makes clear that Leggett understood his options and was articulate as well as persistent about the manner in which he wanted to proceed at trial. When the court's entreaties to work exclusively through counsel were rebuffed, the court advised Leggett of how to avoid prejudice to himself. Neither the court nor counsel could persuade him of the pointlessness of the questions or the irrelevance of areas that he wished to pursue. The court, moreover, took upon itself to ensure that Leggett would have the opportunity to present the evidence that he wanted to present. Before granting Leggett's request, however, the court also determined that counsel was performing responsibly in his client's best interests. In that manner, the court afforded Leggett the benefit of the advice of his counsel as well as the court. Throughout the trial thereafter, the court also took steps to protect against prejudice to Leggett, including advice to the jury of the procedures that would be followed, thereby giving the court's imprimatur to an unfamiliar role for a defendant in a trial.

Because Leggett did not waive his right to the assistance of counsel and failed to invoke his right of self-representation, the Sixth Amendment did not require the district court to caution him regarding the "dangers and disadvantages of self-representation." *See Brown*, 823 F.2d at 599. Leggett wanted both the benefit of counsel and the ability to take the reins himself from time to time—the inverse of *McKaskle*'s standby counsel scenario—and by dint of the court's indulgence, he had his cake and ate it too. *See Mosely*, 810 F.2d at 97. We find no prejudice to Leggett as a result of the hybrid representation that he sought and received, and hence we find no abuse of discretion by the district court.

### III.

▪ Leggett also contends that he was denied his Sixth Amendment right to the assistance of conflict-free counsel. He relies on *Cuyler v. Sullivan*, which held that "a defendant who shows that a conflict of interest *actually affected the adequacy of his* [attorney's] representation need not demonstrate prejudice in order to obtain relief." 446 U.S. at 349–50, 100 S.Ct. at 1719. By contrast, under the *Strickland* test, which is generally applied to other ineffective assis-

---

thought [he] was a key witness in my opinion, and that many, many things that have been brought out or alleged should be able to be verified one way or another through him. So I have—in essence was asking [my counsel] to be as thorough as possible in questioning him. I didn't give him a lot of questions. I just told him I wanted to be as thorough as he could.

But on the questions that I gave him to ask, he turned it all around and got it mixed up. So I'm simply—there are so many things that were not addressed that I wanted to see addressed with [this witness], that I feel obligated to have to ask him some questions himself.

3. The court advised the jury that Leggett, who

has a vital interest in the outcome of this case, obviously, and he also has some familiarity with the work here and of government contracts, has some questions he'd like to ask the witness. I've authorized him to go ahead and ask the witness some additional questions on cross-examination.

4. Leggett's questions touched on the Department's chain of command, whether Leggett's staff was inexperienced and untrained, which buildings MPS was directed to clean, and where an expert witness examined documents.

5. In closing argument, counsel focused the jury's attention on whether a bribe had been solicited and accepted by Leggett or only offered by Lewis, and on various reasons why Lewis was not credible. Leggett repeated the claim that Lewis had unsuccessfully attempted to bribe him, took issue with the government's characterization of the evidence, questioned the veracity and intelligence of the inspectors under his supervision, and concluded by reading Psalm 35.

tance claims, a defendant must demonstrate that (1) counsel's performance was deficient, falling "below an objective standard of reasonableness" and (2) this deficient performance prejudiced the defendant, depriving him of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. As grounds for avoiding the more rigorous standard, Leggett contends that an impermissible conflict is evidenced by counsel's statement to the district court that "if there's a conviction in this case, I know that I'll probably be back up in the witness chair at some point down the road myself." Leggett suggests that counsel's (accurate) prediction of an ineffective assistance claim created an actual conflict of interest between him and counsel. This argument ignores the logic that, as the government suggests in its brief, an attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary. Furthermore, any time a defendant criticizes counsel's strategy, a later ineffective assistance claim is foreseeable; therefore, Leggett's argument would bootstrap all significant tactical disputes into *per se* Sixth Amendment violations.

■■■ That, of course, is not the law, and we are unpersuaded by Leggett's further attempt to style his disagreement with counsel over trial tactics as a "conflict of interest." *Cf. United States v. Farley*, 72 F.3d 158, 166 (D.C.Cir.1995). Leggett notes that the rift with his counsel was sufficiently severe to motivate counsel to request to withdraw, and that during an *ex parte* discussion with the court counsel acknowledged it was "difficult to focus on what's going on" when he was being "second-guessed on everything." A client's difference of opinion regarding trial strategy hardly indicates that counsel is "actively represent[ing] conflicting interests." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719; *see also Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067. Just as friction between a trial counsel and the court does not, as a matter of law, create a conflict of interest between counsel and client, *United States v. Shark*, 51 F.3d 1072, 1076 (D.C.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 405, 133 L.Ed.2d 324 (1995), so too the expected and usual rifts that develop between disappointed defendants and their counsel cannot be char-

acterized as conflicts of interest. *Cf. United States v. Green*, 680 F.2d 183, 190 n. 12 (D.C.Cir.1982), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1204, 75 L.Ed.2d 445 (1983). Differences of opinion about the questions to pose to a witness or the argument to be made to the jury that do not amount to a breach of loyalty to the defendant are not "conflicts of interest" entitled to the *Cuyler* presumption of prejudice. While Leggett and his counsel had different ideas about trial strategy, there is nothing in the record to suggest that counsel faced any "[c]ompetition between the client's interests and counsel's own interests." *United States v. Hurt*, 543 F.2d 162, 166 (D.C.Cir.1976).

■■■ Absent evidence of an actual conflict of interest adversely affecting counsel's performance, Leggett must show, under *Strickland*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. Given the strength of the government's evidence, Leggett could not show prejudice even assuming counsel's performance was constitutionally deficient. Lewis' testimony was supported by other evidence as well as the fact that as contract compliance officer Leggett was in a position to make the demands that Lewis asserted. Carr's acquittal demonstrates not that jurors believed that she earned the money MPS paid her, as Leggett maintains, but only that the government's evidence showed she was, at most, a pawn in the bribery scheme while Leggett was the instigator. Leggett's failure to show prejudice disposes of his Sixth Amendment ineffectiveness claim, although the district court also found that his counsel was competent, commenting that the court did not "see how anybody else [wa]s going to do any better," and that Leggett's complaints were little more than a trial tactic in the face of the government's strong case.

## IV.

■■■ Finally, Leggett contends that he was denied his Sixth Amendment right to the effective assistance of counsel because counsel failed to present Leggett's defense theory

at trial. Leggett's theory was that he failed to enforce the MPS contract because it was in the Department's best economic interest not to have MPS default.[6] This argument is not a legal defense to the charges against him. Any refusal by counsel to present it was a reasonable trial strategy, and does not amount to ineffective representation. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Moreover, counsel explained (in an affidavit responding to Leggett's post-trial motion) that Leggett did not present a cogent theory of the defense during their pretrial discussions, nor an adequate response to the bribery charge. Nor can Leggett show prejudice, for he was not only permitted to pose questions to witnesses and make a closing argument to the jury, but he advised the court at the end of all the evidence that he was satisfied that he had had the opportunity to present all of the evidence that he wanted.

Accordingly, we affirm the judgment of conviction.

---

6. During an ex parte bench discussion, Leggett informed the court that he wanted certain testimony elicited from witnesses so as to bring out: the fact that [he] was determined that [MPS] was going to keep that building clean, and [he] was not going to let that contract default, because in [his] opinion, it costs a whole lot of money to the government if a contractor defaults on a contract than to get them to perform the contract.