UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

DANNY LEE KING,
Petitioner-Appellant,

v.

No. 97-28

FRED W. GREENE, Warden,
Mecklenburg Correctional Center,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CA-93-641-R)

Argued: March 4, 1998

Decided: April 20, 1998

Before WIDENER and MOTZ, Circuit Judges, and CLARKE,
Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Richmond, Virginia, for
Appellant. Robert Quentin Harris, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee. **ON BRIEF:** Mark Evan Olive, Tallahassee, Florida, for

Appellant. Richard Cullen, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury found Danny Lee King had beaten, kicked, choked and stabbed a woman to death; the state court, on recommendation of the jury, sentenced King to death. After pursuing direct appeals and seeking post-conviction relief from the state courts, King petitioned for federal habeas relief. The district court denied his petition, and we affirm.

I.

A.

On June 14, 1991, a jury convicted King of murder, robbery, and two counts of forgery and uttering. All charges stemmed from the brutal murder of Carolyn Horton Rogers on October 11, 1990. The jury recommended a term of life imprisonment plus 40 years for the noncapital offenses. After a separate sentencing hearing, the jury found both future dangerousness and vileness, statutory aggravating factors under Va. Code § 19.2-264.4(c) and recommended a death sentence for the murder conviction. The state trial court considered King's presentence report and then imposed the sentences recommended by the jury.

On April 17, 1992, the Virginia Supreme Court affirmed the convictions and the death sentence. King v. Commonwealth, 416 S.E.2d 669 (Va.), cert. denied sub nom., King v. Virginia, 506 U.S. 957 (1992).

2

On June 11, 1993, King filed an amended petition for state post-conviction relief with the Circuit Court for Roanoke County. The petition was transferred to the Virginia Supreme Court, in accordance with Va. Code § 8.01-654(c)(1). On March 14, 1996, that court dismissed the amended petition.

The Commonwealth of Virginia scheduled King's execution for July 8, 1996. Five days before the scheduled execution date, the District Court for the Eastern District of Virginia stayed the execution pending King's application for federal habeas relief. On July 11, 1996, King's case was transferred to the Western District of Virginia; six weeks later, that court appointed counsel for King. On January 24, 1997, King filed his application for a writ of habeas corpus. On August 4, 1997, without holding an evidentiary hearing, the district court issued a well reasoned, 75-page, memorandum opinion denying the writ. After the court denied King's motion for reconsideration, he appealed to this court.

B.

The Virginia Supreme Court recounted the facts of the case and some of the evidence presented at trial:

> The record shows that on October 1, 1990, King was released on parole from imprisonment for a prior offense. On October 8, he and Becky Hodges King, with whom he had entered into a bigamous marriage in January of 1989, stole a van from a used car lot in Chesterfield County. They then traveled to the home of King's mother in Christiansburg, where Becky had been staying during King's imprisonment.
>
> On October 11, King and Becky rode in the van to Roanoke and went to a residential area known as Kings Chase. As they drove around, Becky wrote on a yellow pad the names and telephone numbers of three real estate agents whose signs were displayed on vacant houses. Carolyn Horton Rogers was one of the agents whose name and telephone number Becky wrote down.

From a nearby shopping center and at King's direction, Becky used the name "Mrs. Keaton" and telephoned Ms. Rogers' office. She told the person who answered that "[she and her husband] wanted to see a house in Kings Chase." When informed Ms. Rogers was not in, Becky placed a call to the Rogers home. Ms. Rogers agreed to show the house in Kings Chase, and she left home about 10:00 a.m. to keep the appointment.

When Ms. Rogers did not return home or appear at her office, her son and two of her co-workers began looking for her. After 5:00 p.m., one of the co-workers entered the vacant house Ms. Rogers had agreed to show and found her body in the basement furnace room, lying face down in a pool of blood. She had been beaten, choked, stomped upon, and stabbed. A ring and an earring had been forcibly removed from her body and were missing, along with other jewelry. Ms. Rogers' automobile was found at a nearby shopping mall.

On the afternoon of the same day, three checks, forged by King and drawn on Ms. Rogers' account, were presented and cashed by Becky at Roanoke area banks. On the same afternoon, Becky pawned Ms. Rogers' ring at a local pawn-shop.

Four days later, King and Becky were arrested in the stolen van in New Philadelphia, Ohio. At the time of his arrest, King spontaneously told Ohio police officers: "[Becky] doesn't know anything about this. I'm the one you want."

\* \* \* \*

In addition to the evidence previously recited, the record shows that King and Becky met Ms. Rogers at the vacant house in Kings Chase and introduced themselves as"Danny and Becky Keaton." Ms. Rogers showed them through the house, and the three of them eventually reached the base-ment. There, Becky asked King for a cigarette. He said he

4

did not have any, and he suggested she get one from their van. Becky left and was gone "a few minutes."

What happened after Becky left was disclosed by the testimony of Vincent Austin Lilley, one of the attorneys appointed to represent Becky on her capital murder charge. On November 2, 1990, Lilley accepted a collect telephone call from King, who was calling from the Powhatan Correctional Center. King told Lilley that "[t]his thing with Becky is, insane . . . because [she] did not do what she's charged with." When Lilley pointed out that Becky had cashed Ms. Rogers' checks and that the police had Becky "on file doing that," King said "she cashed checks because if she wouldn't have, [he] would have broken her damn neck, or she believed that." King asked Lilley to visit him, saying that what he wanted to talk with Lilley about "is the fact that [he, King, was] the one that should be charged with it." Lilley agreed to visit King, and he went to the correctional center on November 6 for that purpose.

On that date, King told Lilley that he was a member of "a Hell's Angels . . . motorcycle gang" and that Ms. Rogers' killing was a contract killing, murder for hire, that was set up before he got out of the penitentiary. He said "a guy named Smoky" contacted him after his release from prison and asked for his help with "a hit." Smoky knew Ms. Rogers was a real estate agent and he wanted to have her show a vacant house because she was "the focus of this murder for hire." Smoky "had [already] been paid." However, Ms. Rogers was supposed to have at least $1,000 in her checking account and King "could get whatever he wanted off of Mrs. Rogers."

The plan was to have Becky call Ms. Rogers to arrange the meeting at the vacant house. King boasted to Lilley that he owned Becky, that she was his "property," and that "[if he] told her to do something, that was it." Lilley asked King how he knew Becky "didn't kill Ms. Rogers." At that point, King "took a little piece of paper . . . and he wrote . . . in capital letters I D-I-D . . . and . . . he said, I did."

5

According to the plan, Smoky was supposed to "come creeping down the stairs and get in the basement," then King was to get Ms. Rogers to the basement and "knock her out to the point of unconsciousness," after which Smoky would "take her to another place and complete the contract killing." King told Lilley he did strike and choke Ms. Rogers until she was unconscious, but he did not stab her. Smoky appeared from the garage area and told King: "[T]hat's good enough. You've done your part." The last thing King saw was Smoky pulling Ms. Rogers' sweater "up over her head."

On December 6, Lilley, accompanied by John Gregory, Jr., Becky's co-counsel, and George Harris, III, Lilley's investigator, again visited King, this time at the Buckingham Correctional Center. After going over some forms with King, Lilley was about to introduce Gregory and Harris when King "just burst out, let's cut the b___ s ___, I stabbed Carolyn Rogers to death. Becky had nothing to do with it. Now, what do you want to know?"

King reiterated that Ms. Rogers' death was a result of a contract killing, and he described how a contract killing is arranged. He went on to say that after Becky left to get a cigarette from the van, he asked Ms. Rogers "some question . . . and at that point he took his fist and hit her[on] the left side of her face." He continued striking her and then choked her and threw her against the basement wall. When she started falling to the floor, he grabbed her by the throat, "squeezed very, very hard," and threw her to the floor. Ms. Rogers was "semiconscious [and] moaning" and he grabbed her at the waist. When he pulled on her limp body,"a sweater type . . . of thing . . . came up, and . . . he could see her brassiere." She must have thought he was going to rape her because "all of a sudden she reached . . . upward into his groin area . . . and squeezed hard." He then removed a knife from his boot and thrust it "in an upward fashion. . . into her chest and that was how he killed her." King directed Becky to drive Ms. Rogers' car to a nearby shopping mall and said he would be right behind her. When King reached the mall, he "wiped down" Ms. Rogers' car to remove any

6

fingerprints. He and Becky then left the mall in the van and thereafter cashed the checks forged on Ms. Rogers' account and pawned the ring stolen from her.

King, 416 S.E.2d at 670-671,674-675.

II.

King initially challenges the constitutionality, as applied, of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Congress enacted that statute effective April 24, 1996; it amends the federal habeas corpus statute. 28 U.S.C.A. § 2254 (West 1994 & Supp. 1998). Chapter 153 of the Act provides for certain changes in the standards of federal court habeas review of all state court convictions. § 2254(d). Chapter 154 creates new procedures for federal habeas review of petitions filed by inmates sentenced to death in states that merit statutory "opt-in" requirements. § 2254(b). The district court held that the Commonwealth of Virginia did not meet the "opt-in" requirements and so refused to apply Chapter 154 of the Act in King's case. The Commonwealth does not appeal that determination.

The district court did apply the Chapter 153 amendments, holding that they applied to all petitions filed after April 24, 1996. See Lindh v. Murphy, ___ U.S. ___, 117 S. Ct. 2059, 2068 (1997). King launches a series of arguments asserting that the district court erred in doing so, that the AEDPA is unconstitutional as applied, and that the district court misinterpreted it. We need not reach these arguments because King has not raised a single ground that provides a basis for habeas relief, even under the pre-AEDPA standards of review. See Satcher v. Pruett, 126 F.3d 561, 567 n.2 (4th Cir. 1997). Accordingly, we turn to examination of King's contentions under pre-AEDPA law.

III.

King maintains that, on several occasions, the Commonwealth obtained statements from him in violation of his rights to remain silent and to counsel.

7

A.

King made his first statement to Detective James Lavinder on October 16, 1990. Lavinder had traveled to Ohio with a warrant charging Becky King with capital murder when he spoke with King, who was detained at the Carroll County jail. King was being held for violation of parole, and Lavinder advised King of his Miranda v. Arizona, 384 U.S. 436 (1966), rights before the two spoke for approximately half an hour. Lavinder made a short telephone call and then began another conversation with King. Before this second conversation began, Lavinder again advised King of his Miranda rights. They talked for 40 to 50 minutes this time, and King reiterated his denial of any involvement in Carolyn Rogers's death. Their conversation ended when King told Lavinder, "I think I better not say anything else until I talk to an attorney."

King asserts that this constituted a request for counsel and that because the Commonwealth failed to honor this request, every subsequent statement that he made to law enforcement officers is inadmissible. The Virginia Supreme Court held that King had waived this contention because "in argument following the close of evidence at the suppression hearing, defense counsel did not once mention the October 16 incident." King, 416 S.E.2d at 671. Instead, he maintained that it was "`clear that . . . the request for counsel took place on November 1st.'" Id. King asserts that"[t]his description is factually wrong," Brief of Appellant at 35, and that the district court's deference "to the Supreme Court of Virginia's finding of procedural default . . .`was not reasonable'" because that court never "`adjudicated [this claim] on the merits.'" Id. at 21.

King's argument is meritless -- the Virginia Supreme Court fully adjudicated the issue on the merits. As the district court noted, "[b]ecause the Virginia Supreme Court found the claim barred under state law, the claim is procedurally barred" from federal habeas review. See Coleman v. Thompson, 501 U.S. 722, 728 (1991). Moreover, our independent review of the record convinces us that the Virginia court's conclusion was correct. At the suppression hearing, defense counsel did, as King maintains, elude to his statement to Officer Lavinder -- and the only statement King made to Lavinder took place on October 16. So, contrary to the Virginia Supreme Court's

8

statement, the "October 16 incident" was "mentioned" at the suppression hearing, if only implicitly. But review of the record unquestionably reveals the truth of the Supreme Court's larger point -- that King never argued at the suppression hearing that he had requested counsel on October 16 but instead asserted he had requested counsel on November 1. King's suppression hearing attorney stated that King "requested an attorney on November 1," and then again that "the request for counsel took place on November 1." Therefore, the state court did not err in ruling that King waived any argument that he invoked his right to counsel on October 16.

B.

On October 18, two days after Lavinder and King's discussion, Detective Ken Kern talked with King in the basement of the Carroll County jail. Kern advised King of his Miranda rights and then showed King the items of clothing that had been seized from the van. Specifically, Kern singled out a particular shirt with a button missing; King stated that he "had never seen it before and it wasn't his." This episode lasted five minutes.

Although it is not absolutely clear, King apparently argues that the statements made during this short conversation should have been suppressed. The Virginia Supreme Court held that King had waived this argument because he "failed to list this statement in his motion to suppress and did not include it in his argument at the suppression hearing." King, 416 S.E.2d at 671 n.1. (relying on Va. Rule 5:25). Accordingly, the claim is procedurally barred from habeas review. Coleman, 501 U.S. at 728. Moreover, our de novo review again convinces us that the record fully supports this holding.

C.

Two weeks later, on November 1, 1990, Detectives Kern and Patrone went to the Powhatan Correctional Center where King was being held on parole violations (he had not yet been charged in connection with Rogers' murder) to execute a court order to take King's hair and blood samples and fingerprints. The Assistant Warden escorted the detectives to King's room and told King the detectives could answer any questions he might have. Before the officers could

9

show King the court order or ask him any questions, King asked them what was taking them so long to "drop warrants" on him and stated that Becky was not involved in the Rogers death, adding that she would "follow a puppy dog." Detective Kern advised King of his <u>Miranda</u> rights and explained that the officers were executing a court order to obtain the samples. King indicated that he understood his rights and refused to sign a waiver. He said that the officers would not find anything because he was "too good." King then volunteered to make a statement if he was provided with an attorney, at a meeting with the police, a prosecutor, his attorney, Becky, and Becky's attorney. The officers responded by telling King that he was not charged with any crimes related to Rogers' murder so they "could not" provide him an attorney; however, they also told him that he could retain an attorney on his own.

King made several more statements while the officers collected the samples. He told the detectives that they should be fingerprinting other people. The detectives responded that they knew that only three people -- King, Becky, and Rogers -- were in the house at the time of the murder. To this, King replied that the people he mentioned, who the officers should be fingerprinting, "had nothing to do with this offense."

Eight days later, on November 9, the officers transported King to Roanoke County jail in order to take foot impressions and to conduct a handwriting analysis. Before transporting King, Officer Patrone again provided King with his <u>Miranda</u> rights. While the police took the samples, King told Kern, "[i]f you got questions, just ask me." Kern then proceeded to ask King about the murder. King denied killing Rogers. However, he made several incriminating statements. For example, he acknowledged being with Rogers and Becky in the house where the murder occurred; he claimed that a man named "Dude" had Rogers on the floor when he left the house. King also admitted that he took Rogers' checks and jewelry.

After providing this account, King reiterated his desire to make a statement before a prosecutor, Becky, Becky's lawyer, and counsel appointed for him. The officers then contacted an Assistant Commonwealth Attorney, who went to King and told King that he was willing

10

to listen. King repeated his earlier account and acknowledged that he might be "pulling the trigger" on himself in telling this story.

King maintains that under Edwards v. Arizona, 451 U.S. 477 (1981), the statements that he made on November 1 and 9 should not have been admitted at trial because he requested counsel on both occasions. The Virginia Supreme Court rejected this argument -- and with good reason. See King, 416 S.E.2d at 360-62.

In Edwards, the Supreme Court held that when an accused has invoked his Fifth Amendment, Miranda right to have counsel present during custodial interrogation, all interrogation must cease until counsel is made available "unless the accused himself initiates further communications, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. Subsequently, the Court clarified that an Edwards right can only be invoked by an "unambiguous[ ] request for counsel." Davis v. United States, 512 U.S. 452, 461 (1994).

As the Virginia Supreme Court ruled, King, 416 S.E.2d 672-73, King's statements during the November conversations concerning his desire to meet with several people including "an attorney for himself" simply do not constitute an "unambiguous request for counsel." Davis, 512 U.S. at 455; see also McNeil v. Wisconsin, 501 U.S. 171, 177-79 (1991) (statement must reasonably be construed to "express[ ] a desire for the assistance of an attorney in dealing with custodial interrogation by the police").

In addition, despite the fact that King was in custody, the November conversations between King and the detectives were not interrogations for the purposes of Miranda or Edwards. See Rhode Island v. Innis, 446 U.S. 291, 300 (1979) ("Interrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself"). The detectives were executing court orders when they met with King on November 1 and 9; in neither of these encounters did the detectives meet with King in order "to elicit an incriminating response." Id. at 301.

Moreover, King initiated the November 9 conversation-- telling the police "[i]f you got questions, just ask me." In doing so, King waived his Fifth Amendment rights. See Solem v. Stumes, 465 U.S.

11

638, 640-41 (1984). (Arguably, in asking the police what was taking them so long "to drop warrants" on him on November 1, King may have initiated that conversation as well.)

King also argues that the officers misinformed him of his right to counsel on November 1 when they told him that they could not provide him with counsel before he was charged. King does not contest the fact that the officers had the "option" either to provide counsel or to cease interrogation, however, he argues that they only told him that they "could not" provide counsel. See Reply Brief at 23-24. King never raised this claim at trial, on direct appeal, or in his state habeas petition. It is, therefore, defaulted. See Gray v. Netherland, 116 S. Ct. 2074, 2080 (1996). In any case, the information the officers provided King was accurate, albeit not complete. Had King indicated that he did not want to discuss anything with the officers unless he was provided with an attorney, he would have been invoking his Fifth Amendment right to counsel, and the officers would either have to provide him with an attorney or cease questioning him. See Edwards, 451 U.S. at 481 (requiring the police "to inform the suspect of his right to counsel and to cease questioning immediately if the suspect wants legal aid"). But King did not do this. Rather, as noted above, he waived that right. Furthermore, as the police accurately related to King, he had no Sixth Amendment right to counsel until he was formally charged with the crimes. See Kirby v. Illinois, 406 U.S. 682, 687-88 (1972). The district court properly concluded, "[n]othing in the record suggests that the police deliberately delayed the initiation of formal criminal proceedings in order to deprive King of access to an attorney or intentionally misrepresented King's constitutional rights."

King also maintains that he did not make a knowing, intelligent and voluntary waiver of his right to counsel during the November conversations with the officers. However, nothing in the record indicates that King's decision to continue his discussions with the officers was coerced or manipulated. Rather, the Virginia Supreme Court accurately pointed out that after each occasion in which King mentioned the possibility of being appointed counsel, King initiated subsequent conversation with the officers. King, 416 S.E.2d at 673; cf. Edwards, 451 U.S. at 483 (noting that a individual can waive his right to either

12

be appointed an attorney or terminate the questioning if he initiates further conversation).

D.

Even if admission of King's October and November statements to the police constituted error, under binding circuit precedent that error would be harmless. In Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc), we held that admission of a defendant's lengthy, detailed, and tape-recorded confession was harmless, even though that confession was recognized as determinative of the verdict by the trial judge and provided most of the basis of the prosecutor's closing argument. We concluded that, in view of two short and poorly recollected prior confessions and certain circumstantial evidence, admission of the tape recorded statement did not have "a substantial and injurious effect or influence in determining the jury's verdict." Id. at 370 (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

King maintains that his case is different than Cooper's; he's correct -- it is different, and substantially weaker than Cooper's case. The two "differences" King offers are: (1) his asserted Edwards violations occurred before he made any incriminating statements, while Cooper's occurred after an incriminating statement and (2) his statements were used to impeach his trial testimony, while Cooper's were not. King does not cite a single case holding that these differences are constitutionally significant. They are not. Rather, the fundamental inquiry in determining whether a state trial error is harmless on federal habeas review is whether it had a "substantial and injurious effect or influence on the jury's verdict." Brecht, 507 U.S. at 658. Only if a judge "is in grave doubt about the likely effect of an error on the jury's verdict" does a habeas petitioner prevail. O'Neal v. McAnninch, ___ U.S. ___, 115 S. Ct. 992, 995 (1995). We have no such grave doubt here.

In his October and November 1 statements, King simply denied all involvement in the murder. Admission of those statements clearly did not substantially and injuriously affect the jury's verdict, particularly when considered with the mountain of other evidence incriminating King.

In his November 9 statements to the police, King did link himself to the murder, but his statements to Becky's attorneys, Lilley and

13

Gregory, were far more damaging. In none of the statements made to the police -- not even the November 9 statement-- did King confess to the murders; in both of his statements to Becky's counsel, he did. In fact, during King's second visit with Becky's attorneys on December 6, 1990 he stated: "Let's cut the bullshit. I stabbed Carolyn Rogers to death." This followed his prior admission in a November 6 conversation with them, when he wrote "I did" in response to their questions as to how he knew that Becky had not killed Rogers. Further, King's first confession to Becky's lawyers was made prior to the statement made to the officers on November 9. (Thus, one of the asserted "differences" between King's and Cooper's case disappears). King followed this admission with a later, even fuller, confession to Becky's lawyers on December 6. Considering these graphic, detailed, and dramatic confessions and the physical evidence linking King to the murder with the assertedly, illegally admitted statements made to the police officers, utterly convinces us that the statements to the police had no substantial or injurious effect on the jury's verdict.

IV.

King also contends that he was denied the right to conflict-free counsel and to proceed pro se in violation of the Sixth, Eighth, and Fourteenth Amendments. Because King failed to raise either claim on direct appeal or in his state habeas petition, he has failed to exhaust them. See Gray, 116 S. Ct. at 2080-81. However, we need not dismiss the claims without prejudice to permit King to exhaust his state remedies, because, for the reasons set forth by the district court, these non-exhausted claims are barred from review in state court. See id. Moreover, as outlined below, both claims are also meritless.

A.

"[A] defendant who desires to invoke his right to self-representation, thereby waiving his right to counsel, must do so `clearly and unequivocally.'" See Fields v. Murray, 49 F.3d 1024, 1029 (4th Cir. 1994) (en banc) (quoting United States v. Reddeck, 22 F.3d 1504, 1510 (10th Cir. 1994)). King never did this. Rather, after he had been convicted of these brutal crimes, King asked the court for permission to represent himself until "other counsel [could] be appointed to represent" him. Indeed, when he argued this motion,

14

King requested the appointment of new counsel. Nor, contrary to his contentions before us, did King unequivocally state his desire to proceed pro se and waive his right to counsel in his pro se brief to the Supreme Court of Virginia. In that brief, King asked the court to consider the arguments "in his pro se brief in addition to any appeal filed in his behalf by counsel." Thus, King never made clear that he truly wanted to proceed pro se. Moreover, even King's equivocal request to proceed pro se until counsel could be appointed did not occur until after the guilt phase of his trial. For this reason, the decision of whether to permit him to discharge counsel and to proceed pro se was well within the trial court's discretion. See Bassette v. Thompson, 915 F.2d 932, 939-42 (4th Cir. 1990) (finding criminal defendant has no constitutional right to represent himself on appeal); United States v. Gillis, 773 F.2d 539, 560 (4th Cir. 1985) (same). Accordingly, even if King had clearly expressed his wish to proceed pro se on appeal, his argument that the court's refusal to permit this violated his constitutional rights would be meritless.

B.

King's claim with respect to his right to conflict-free counsel is equally unpersuasive. In his pro se brief to the Virginia Supreme Court, King never raised a constitutional challenge that he was denied conflict-free counsel. Nor did he raise this issue in his state habeas petition. Accordingly, federal habeas relief is barred. See Gray, 116 S. Ct. at 2080-81.

Moreover, even if King had preserved the claim of a conflict with his counsel, it is meritless. The crux of this claim is that defense counsel "had not presented the case in the manner that King wished, to the point of directing King to perjure himself on the stand." Brief of Appellant at 39. The alleged perjury concerned King's testimony about "stomping" the victim. After two experts had opined that King's boots had left very distinctive marks on the victim's head, King's counsel advised him that denying the stomping in view of this strong evidence would risk conviction and the death penalty. King reluctantly followed this advice and testified that he did not remember the stomping, when actually, he asserts, he remembered that he did not stomp the victim.

15

King's claim is not really one that counsel had a conflict with <u>his</u> interest. <u>Cf. Cuyler v. Sullivan</u>, 446 U.S. 335, 350 (1980). In fact, it is clear that counsel were acting in what they perceived to be King's interest in giving this advice. Rather, King's claim constitutes a disagreement with his counsel's trial tactics. Indeed, when he responded to his counsel's motion to withdraw, King contended simply that he disagreed with the trial tactics of his counsel:"counsel was not presenting the defense he wished presented to the Court." Moreover, as noted above, King did not assert that he was denied conflict-free counsel in this response, nor did he raise this issue in his state post-conviction pleadings. Thus, King's real contention seems to have been that he disagreed with his counsel's trial strategy. Such a claim is not one for conflict-free counsel but for deprivation of effective assistance of counsel. <u>See United States v. Leggett</u>, 81 F.3d 220, 227 (D.C. Cir. 1976). As such, it must fail because King cannot demonstrate this aspect of counsel's representation was either deficient or prejudicial.

V.

King argues that he was denied his constitutional right to effective assistance of counsel. The Supreme Court has articulated a two-part test to examine an ineffective assistance claim. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a defendant must demonstrate that the performance of his trial counsel failed to meet an objective standard of reasonableness. <u>Id.</u> at 688-89. Second, a defendant must show that this failure resulted in prejudice, <u>i.e.</u>, that there is a reasonable probability that the outcome of the trial would have been different without his counsel's errors. <u>Id.</u> Determinations regarding the effectiveness of counsel involve mixed questions of fact and law that we review <u>de novo</u>. <u>Smith v. Angelone</u>, 111 F.3d 1126, 1131 (4th Cir.), <u>cert. denied</u>, ___ U.S. #6D6D 6D#, 118 S. Ct. 2 (1997).

A.

King maintains that his trial counsel should have argued in his motion to suppress that King requested counsel on October 16, rather than exclusively asserting King requested counsel on November 1.

First, as the district court observed, counsel's decision to focus on the November 1 request made sense strategically. The October state-

16

ments made by King did not damage his case, rather, in them, he denied his involvement in the crimes. Thus, counsel did not have the same incentive to suppress the October statements as he did those made in November. Accordingly, counsel's failure to focus on the October 16, rather than November 1, well may not be deficient at all.

Moreover, even if counsel did err in not focussing on the asserted invocation of counsel on October 16, King cannot demonstrate any prejudice resulting from this action. In none of the statements King made to the officers did he admit that he committed the murder. Rather, his multiple confessions were made to Becky's lawyers. Furthermore, in King's October and November 1 statements, he denied any involvement in the murder. Moreover, his November 9 statement (in which he did make damaging admissions concerning his involvement in the crimes) would have been admissible even if King's attorney had successfully argued that he had requested counsel on October 16 and the state trial court had excluded the October and November 1 statements because King initiated the November 9 conversation with the officers.

King also argues that his counsel's failure to make the argument that King had not intelligently, knowingly and voluntarily waived his right to counsel or to end the conversations with the officers constituted ineffective assistance of counsel. As we discussed previously, the substance of King's claim concerning waiver is meritless. The record does not provide evidence that King's decision to continue to initiate discussions with the officers was involuntary or somehow coerced. Since King's arguments concerning waiver lack merit, his counsel was not deficient in failing to make this argument.

B.

King next contends that his counsel erred in failing to maintain that King enjoyed an attorney-client relationship with Becky's counsel, Lilley, such that his communications to Lilley were privileged.

The record reflects that Lilley informed King on several occasions that he represented Becky, not King. In fact, in their first conversation, Lilley stated "I'm not your lawyer." In addition, on November 6, 1990, King executed a waiver, which Lilley had prepared, that

17

memorialized that King knew Lilley was acting solely for Becky: "I understand that Vincent A. Lilley represents Becky Hodges King and that he will protect her interests, and not mine." After Lilley went over the waiver word for word with King, King signed it. The two men then talked for approximately two and one-half hours, and during that discussion King confessed to the murder.

The day after that conversation, King called Lilley once again. Becky's other counsel, Jack Gregory, also took part in this telephone conversation. Gregory reiterated that he and Lilley represented Becky's interests only, and King acknowledged this. During the course of that conversation King asked Gregory and Lilley how he should deal with the media, and Lilley replied,"I don't represent you. I represent Becky . . . And you've got to get your own lawyer to give you advice because I'm not on the same side of this thing with you." Gregory supported this statement by remarking to King, "[W]e're on opposite side of the fence," and encouraged King to get his own counsel. Later in the conversation, King told Becky's attorneys:

> I'm very well aware of y'alls major purpose in this thing. I am very well aware of the fact in more ways than one we are on opposite sides of the fence because of the fact that uh, y'alls main concern, if anything, would be to hang me if that would protect Becky.

King telephoned Lilley and Gregory once again on December 3, 1990. He initially told them that he understood that they were acting solely as Becky's counsel, and then they arranged a meeting for December 6. An investigator accompanied Lilley and Gregory when they met with King at Buckingham Correctional Center for that meeting. At its outset, King signed another waiver acknowledging that Lilley and Gregory did not represent his interests.

The record indicates that King had an interest in contacting Lilley precisely because he was Becky's attorney, and King wanted to help Becky. But regardless of King's motivation for contacting Becky's counsel, the record is clear that King understood that Lilley and Gregory did not represent his interests.

The district court noted that perhaps King's strongest argument concerning attorney-client privilege would have been under the "com-

18

mon interest" rule, which recognizes the need of defendants charged with the same crime to discuss with each other the pursuit of a joint defense. See, e.g., Hicks v. Commonwealth, 439 S.E.2d 414, 415 (Va. 1994). However, as the district court pointed out, even if King had made this argument, it would have been rejected because King's discussions with Becky's counsel were not made to pursue a joint-defense or "with any reasonable understanding that the communications would remain confidential."

For all of these reasons, counsel for King did not perform unreasonably in not pursuing the attorney-client privilege claim.

C.

King also asserts that his counsel's representation was ineffective during the penalty phase of the trial because counsel failed to develop mitigating evidence concerning King's childhood. King argues that his attorney should have investigated and documented the abuse he suffered as a child, particularly the physical and emotional abuse King received from his father. According to King, this included "severe beatings, including the use of electrical cords, belts and sticks, which caused deep welts and cuts, bleeding, and excruciating pain." Brief of Appellant at 49.

We note at the outset that King's counsel did in fact present evidence of King's abusive childhood. King's mother, Anna Mae King, testified that King's father drank alcohol and abused King both physically and verbally. According to Mrs. King, the abuse began when King was a baby and continued throughout his childhood. She testified that after one of the beatings King received from his father, his back was bloody and covered with welts. Thus, although further family testimony undoubtedly would have added more details, it might well have simply been cumulative.

Furthermore, whether or not counsel should have presented more extensive evidence of the abuse King suffered as a child, not presenting such further evidence did not prejudice King. In fact, more such evidence might have harmed King's defense. As the Commonwealth points out, the jury might have interpreted such a history of abuse as evidence that King would be dangerous in the future. Cf. Penry v.

19

Lynaugh, 492 U.S. 302, 324 (1989) (noting that such evidence of abuse may "indicate[ ] that there is a probability that he will be dangerous in the future"); Barnes v. Thompson, 58 F.3d 971, 980 (4th Cir. 1994) (history of abuse may indicate future dangerousness). In this regard, counsel provided a defense psychologist who stated that while incarcerated King did not pose a danger to others. Including more extensive testimony of King's background of being abused could have undermined defense counsel's argument at sentencing that King would not pose a danger in prison. This is particularly true in view of the fact that none of the three experts who submitted affidavits for King in state court, support his contention that the effects of his abuse were "readily treatable."

In addition, King's argument that his counsel should have presented testimony concerning King's good behavior in prison is meritless. King maintains that his counsel should have obtained the testimony of his prison work supervisors, who he argues would have testified that during his previous incarcerations they permitted King to retain dangerous tools in his cell and to perform repair work outside the perimeter wall of the prison. King also notes that his counsel did not put on the testimony of a prison guard whose life King helped save. He argues that this testimony and the testimony of a witness "with special experience and knowledge in reviewing and analyzing a prisoner's corrections records" would have helped "explain" his prison record. Reply Brief at 29.

King's counsel, however, did provide evidence of King's record in prison and introduced the contents of the prison guard's letter concerning the incident in which King helped save his life. This evidence provided an understandable description of King's behavior during his previous incarcerations. The addition of further testimony would have been cumulative. Moreover, there is no reasonable probability that the outcome at sentencing would have been different had such evidence been introduced. See Strickland, 466 U.S. at 691.

D.

King also maintains that counsel should be held ineffective for not objecting to the verdict form presented to the jury and the sentencing instructions. He argues that the jury could have been misled into

20

believing that it had to impose the death penalty if it found one of the two aggravating factors present.

When viewed in their entirety, however, the court's instructions and the verdict form provided adequate guidance to the jury. King's argument ignores the portion of the instructions in which the court stated:

>  If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the two alternatives, and as to that alternative you are unanimous, then you may fix the punishment of the defendant at death <u>or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment.</u>

(emphasis added).

This instruction clearly provided the jury with discretion not to impose the death penalty even if it found aggravating factors present. Moreover, in maintaining that his counsel was deficient, King fails to recognize that his counsel offered alternative sentencing instructions with respect to the jury's ability to recommend a life sentence, but the court refused to provide these instructions because the matter was adequately covered.

King's contention that the jury may have interpreted the instructions so as to require unanimity if it recommended a life sentence is foreclosed by <u>Evans v. Thompson</u>, 881 F.2d 117, 123-24 (4th Cir. 1989), <u>cert. denied</u>, 497 U.S. 1010 (1990). There, we held that an instruction such as the one provided in this case accurately reflects Virginia law. <u>Id.</u> The failure of defense counsel to object to such instructions does not constitute ineffective assistance of counsel.

King also maintains that the aggravating factors considered in this case -- vileness and future dangerousness -- are unconstitutionally vague. He asserts that his counsel's failure to challenge the constitutionality of these aggravating factors constituted ineffective assistance of counsel. We disagree. We have previously upheld the constitution-

21

ality of both vileness and future dangerousness as aggravating factors. See Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir. 1990); Giarratano v. Procunier, 891 F.2d 483, 489 (2d Cir. 1989). Based on this precedent, counsel clearly was not deficient in failing to raise such a challenge.

VI.

King contends that the trial court violated his rights under the Eighth and Fourteenth Amendments when it denied him the opportunity to rebut the state's evidence as to his future dangerousness by presenting evidence that if he received a life sentence he would not be eligible for parole for thirty years.

In Simmons v. South Carolina, 512 U.S. 1564 (1994), the Supreme Court held that if the government seeks the death penalty based on a defendant's future dangerousness a capital defendant has a due process right under the Fourteenth Amendment to provide evidence indicating his ineligibility for parole. Id. There are two reasons why Simmons does not support King's claim. First, Simmons was a case in which the defendant was ineligible for parole as a matter of law; subsequent cases have limited Simmons to that realm. See Ingram v. Zant, 26 F.3d 1047, 1054 n.5 (11th Cir.), cert. denied, 513 U.S. 1167 (1995). King does not maintain that he was ineligible for parole as a matter of law. Therefore, Simmons provides no assistance to him.

Second, Simmons' ruling in 1994 announced a"new rule" of procedural constitutional law. See O'Dell v. Netherland, 117 S. Ct. 1969 (1997) (holding that Simmons rule was a new rule that could not be used to disturb habeas petitioner's death sentence). As the Court explained in Teague v. Lane, 489 U.S. 288, 300-01 (1989), a "new rule" is not to be applied retroactively on habeas appeal. With regard to King's assertion of an Eighth Amendment (rather than Fourteenth Amendment) right, the district court correctly pointed out that we recently held that to extend the Simmons rule to the Eighth Amendment would be to create a "new rule." O'Dell v. Netherland, 95 F.3d 1214, 1238 n.13 (4th Cir.), aff'd, 117 S. Ct. 1969 (1997).

22

VII.

King makes several arguments that he was denied his due process rights and effective assistance of counsel because evidence exonerating him was not introduced at trial.

A.

King claims that his counsel should have developed evidence to demonstrate that Becky, not he, killed Rogers. He contends that there is exculpatory evidence that would have supported his theory that this was a "contract murder." Specifically, King claims that his counsel failed to obtain a "package of materials" that exonerated him by indicating that Becky killed Mrs. Rogers in an effort to settle a drug debt.

The record provides no support for this argument. The Commonwealth presented evidence that several real estate agencies received telephone calls from Becky seeking to have an agent show her a house. In addition, the Commonwealth introduced a legal pad, found in King's van, which listed the names of contact information of three real estate agents in the area. This evidence contradicts King's assertions that Becky specifically wanted to kill Mrs. Rogers.

In addition, this argument was presented in King's federal habeas petition for the first time and thus has not been exhausted. Moreover, as the district court pointed out, Virginia law prevents a defendant from raising a claim in an additional habeas petition unless the facts giving rise to this claim were not known by or available to the defendant at the time he filed his initial habeas petition. Va. Code Ann. § 8.01-654(B). As the district court concluded, King has failed to allege "any particularized facts demonstrating that the facts giving rise to his claims were unknown or unavailable to him at the time he filed his first habeas petition." Accordingly, this claim is both unexhausted and procedurally defaulted. See Gray, 116 S. Ct. at 2080-81.

B.

King also maintains that his counsel "failed to develop and present serological and forensic evidence showing that King was not in the

23

presence of the victim when she was killed." Brief of Appellant at 63. Specifically, King focuses on the boots that left footprints in blood at the scene of the crime and marks on Mrs. Roger's head.

Detective Kern testified that King had acknowledged that the boots were his. The Commonwealth's expert opined that even though no blood was found on the boots, fresh blood can readily wash away in water. Moreover, the Commonwealth provided evidence that it rained on the day of the murder. Another state expert testified that King's boots, or a pair identical to them, had left multiple marks on Mrs. Roger's head.

King's counsel had obtained funds to retain an expert to evaluate the evidence regarding the bootprints on Mrs. Roger's head. However, as the district court noted, this expert, while not as convinced as the Commonwealth's expert that the marks on Mrs. Roger's head came from the boots, informed King's counsel that he believed the boots "appeared to match the marks on the victim's head." King now argues that his counsel only had this expert review the Commonwealth's photographs of the evidence, and these photographs had been altered and did not possess a scale. See Brief of Appellant at 30. Thus, King maintains that his counsel did not have the expert examine the actual evidence.

However, this argument ignores the fact that the Commonwealth's expert had enlarged the photographs in an effort to better analyze them and used these photographs in determining that King's boots caused the prints on Mrs. Roger's head. In addition, there is no evidence that King's expert stated that he needed to view the actual evidence in order to make such a determination. Thus, counsel's decision not to pursue further inquiries with respect to this forensic and serological evidence or to challenge such evidence at trial was a reasonable tactical decision, clearly not one that was deficient.

VIII.

For all of these reasons, the judgment of the district court is, in all respects

AFFIRMED.

24